41,809-03

Thomas Lee Evans

TDCJ #435211 /Wynne Unit

810 FM 2821

Huntsville, Texas 77349

July 16, 2015

Court Of Criminal Appeals,

Clerk, Mr. Abel Acosta

P.O. Box 12308, Capitol Station

Austin, Texas 78711

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUL 21 2015

Abel Acosta, Clerk

RE: Ex parte Thomas Lee Evans, 410th District Court, Montgomery County, Cause No. 19180-(I), Judge's Denial Of Writ (TC.C.P, Art. 11.07) without allowing me to submit evidence in hearing.

To The Honorable Clerk, Mr. Abel Acosta:

Please find enclosed with this letter, the following information in response to the trial judge's blanket denial of my writ based upon the time it has taken me to learn the law and file my writ:

1. Applicant's Response To District Court's Blanket Denial Of Writ Based Upon Laches, 6 pages, with Inmate's Declaration;

2. Exhibit #1, Affidavit Of Due Diligence For Court Of Criminal Appeals, 20 pages, with Inmate's Declaration

3. Exhibit #2, Affidavit of Mr. Curtis Cook, Expert Eye Examiner, 5 pages, with oath, declaration;

4. Exhibit #3, Affidavit of Mr. Larry Ragle, Expert from the Center for the Forensic Sciences, 22 pages, including oath/declaration;

1

4. Exhibit #4, Portion of Statement of Facts, Volume III, Pages 365-389, with Authentication Form from Director, Robert Schaadt, Sam Houston Regional Library + Research Center, in Liberty, Texas. This is in support of Mr. Ragle's affidavit showing the State and its witness lied, and that the D.P.S. Chemist was allowed to give hearsay testimony about the Hair Specialist's findings.

✷    ✷    ✷

Sir, would you please allow me to have copies of these items? I am an indigent person with no access to a copier.

Please file these papers with the court in response to the trial court's denial of my writ, 11.07, T.C.C.P.

Thank you very much for your assistance.


Respectfully submitted,

_Thomas Lee Evans_

Thomas Lee Evans
TDCJ #435211/Wynne Unit
810 FM 2821
Huntsville, Texas 77349


P.S. I hope this stickers are not wrong. Please remove them if they are. I simply wanted it to be easier to locate.

2

* * *

CAUSE NO. 19180-(1)

| | |
|---|---|
| Ex Parte | § In The District Court For |
| Thomas Lee Evans | § The 410th Judicial District, |
| | § Montgomery County, Texas |

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUL 21 2015

Abel Acosta, Clerk

Applicant's Response

To The Honorable Court Of Criminal Appeals:

My name is Thomas Lee Evans, the Applicant in Writ of Habeas Corpus, Under Article 11.07 of the Texas Code of Criminal Procedures, brought before the above styled court. In my Application I brought seven issues before the court alleging ineffective assistance of appeal counsel for failing to raise the issue in my behalf in my first appeal. I will not reiterate those issues raised in my writ and the memorandum, but will address the Judge's Blanket Denial To Hear All Of My Issues Because Of The Amount Of Time That Has Passed. As the attached Affidavit Of Due Diligence will prove I have dutifully attempted to learn the law, gather affidavits to prove my claim of actual innocence, then present my writ within 7 months of my last entry. (I obtained a letter from the Texas Medical Board, regarding my 1986 inquiry about one of the State's alleged "Experts" and they had no listing on March 6, 2014.)

* * *

1.

## RICHARDS V. QUARTERMAN
### 578 F.Supp. 2d 849; 2008 U.S. Dist. LEXIS 66221

In a mirror image of the above Richards case, the Court recieved my Writ, found previously unresolved issues in dispute and order the court appointed appeal attorney to make an affidavit addressing my claims within 30 days. After 118 days I ask in a motion requesting legal assistance if counsel has violated the 30 day order, he then responds with "no memory." The State then files its claim, and the Judge accepts the State's claim, that they cannot respond to my writ because of the delay in my filing the Writ late.

The reasons the State gave for denying the whole writ, was the Clerk said she hasn't seen the reporter's note since about 2008, that the lawyer has no memory of my allegations against him, and I waited too long without any explanation about why it has taken so long.

In a Richards type hearing I was not allowed to present any evidence in my own behalf, not allowed to be present and thus object to the onesided presentment of evidence. In addition, just like in Richards, My Writ judge was different than my trial judge.

### Objection,
### And Evidence I Would Have Presented.

In a hearing to determine the facts of the effects of all the above mentioned State presented evidence I would respectfully ask that the controverted issue be resolved in my favor due to the following facts:

⁑ 1. I contacted the Trial Clerk and her constituents numerous times about obtaining a transcription of the notes and they never once told me that it could not be focused. I have retained every letter and in my Affidavit Of Due Diligence, attached here

2.

for your consideration are each of the entries. I purchased my copy of the Appeal File, including the trial testimonies quoted by Volume, Page and Line throughout my writ. It is of no fault of my own that the Clerk could not come to terms with her loss each of the times I asked for it. With the trial testimonies found in the appeal file, the truth of my issues are just as obvious. A copy can be obtained for .10¢ a page at the Sam Houston Regional Law Library + Research Center over in Liberty, TX. It is my understanding that the records are to never be destroyed. As an incarcerated person I can't come to terms with this being my fault.

#2. The State claimed that I failed to address my delay in filing the writ. (They act as if I was incarcerated lawyer who sat around waiting for time to pass.) As my affidavit for your Court shows, I also included an affidavit for them. When I filed my writ the Clerk stamped my stuff filed and returned copies to me. I don't know why they failed to pass on my affidavit. I also had two other affidavits in there, one from Larry Ragle, a forensic specialist, (Proving the State and its witness lied in my trial, etc); one from Curtis Cook, who has been in the eye examination field for over 45 years (since he was a kid working for his dad) who said the State's witness lied in my trial about an eye glass prescription; and a letter to Texas Medical Board, who said they had no listing for the State's witness as a doctor, or any other part of the field. The D.A. told the judge and Defense that she was an ophthalmologist, a "master" of her field. Did the clerk mail all of these items to you as Ordered by the judge? As she did not send me a copy of the file I have no idea.

#3. The attorney's memory loss is again an item that can't possibly be attributed to me. It would be a mockery of the justice system for this guy's memory to be the bases upon which my writ was denied. I was given court appointed counsel who had never led a jury trial and

3.

one other voir dire of a jury, with all of this scientific, technical information and then after she was taken off my case they give me this appeal counsel who file one error for me (incorrectly) and did not include any of the exhibits in the appeal file. Because of him, the Judge, the D.A. and the Clerk, I have been here all these years trying to learn the law enough to raise some of my issues in my quest for innocence. How can anybody say that I didn't learn the law fast enough? I washed dishes and served food. I had around a 7.5 - 7.9 grade average with a G.E.D. I had no training. I wasn't a lawyer and I'm not one now. I've been doing my best with my limited mental abilities.

*4. Please refer to my affidavit. I've tried to take you guys through all of it. I simply would not set here in prison if I wasn't forced to.

*　*　*

<u>Ex parte Smith</u>, 463 S.W. 2d 185

(Tex. Crim. App. 1971)

In Smith, above, the background of our inexperience is nearly exact. Where, at the time of my indictment was returned against me, I was 18 years of age, was indigent and inexperienced in legal matters, I recieved no advice from my court appointed counsel, or anyone else, with reference to my constitutional and legal rights in a criminal trial, I should be entitled to habeas corpus relief on ground of ineffective assistance of counsel. In addition to this I had about a 7.5 - 7.9 grade average, and washed dishes and served food before my arrest. I had a GED only, and no law training.

*　*　*

<u>Ex parte Jordan</u>, 879 S.W. 2d 61

(Tex. Crim. App, 1994)

One of the issue the State claims it can't address is that of my prior convictions. In an exact same priors question, involving ineffective

4.

assistance for failing to investigate them, the Court in Jordan ordered a hearing to determine the facts. Regarding the "time" issue, the prior from Jordan's 1994 ruling was in 1959, in Louisiana, about 36 years prior.

Some of my other issues are right on the page. The D.A. compared my right to cross-examine the complainant as being assaulted for a second time. How hard is it for the State to look on the page, read my case law and agree with my issue? At punishment the D.A., again, constantly violated my right to remain silent during punishment by commenting on my tears, the reasons for them from his own imagination, and asked the jury questions they should ask me. Two so-called experts lied, and now I have proof. Look on the pages I quoted, turn to my affidavits, and compare fiction to reality. Please, please don't force me to learn the law and then punish me for learning it too slow. I can wash dishes, fix cars, not the law.

\* \* \*

## Conclusion/Prayer

In conclusion, in Richards v. Quarterman, 578 F.Supp. 2d 849; 2008 U.S. Dist. LEXIS 66221; the one-sided paper hearing was addressed. As in there, My trial judge is different than my writ judge and the State was allowed to submit all of the evidence (Clerk's claim, lawyer's affidavit and the time with my excuse) and the Court called such actions a "mockery." At the very least, it is my prayer that you will hold a hearing on this issue so that I can at least present the real facts into the record of my due diligence as is found in my affidavit, here attached.

Thank you for your consideration.

Respectfully submitted,

Thomas Lee Evans
TDCJ #435211/Wynne Unit
810 FM 2821
Huntsville, Texas 77349


"Inmate's Declaration"

I swear under the fear of the penalty of perjury that everything in this Response and Due Diligence affidavit are true to the best of my ability to know. Today's date is July 16, 2015,

Signature: _Thomas Lee Evans_

Thomas Lee Evans


I hope this is not improper but at the conclusion of each of my writ issues I made the statement that even with this last claim of evidence thrown out because of my affidavits by true experts, I would still attempt to engage the state in a meaningful plea agreement. I don't want to go to a new trial and subject the complainant and my family to that again. I don't want to sue the state or bad mouth them in any way. All I want is to get out, get to work, save money and pass my last few years writing on my books and thanking God for my freedom.

Thank you for your consideration.

Respectfully submitted,

_Thomas Lee Evans_

6.

EXHIBIT #1

## COURT OF CRIMINAL APPEALS

Ex Parte Thomas Lee Evans     §     In The 410Th District Court

Trial Court Writ Number: 19180-CR-(1)    §     Of Montgomery County,

§     Texas

## AFFIDAVIT OF DUE DILIGENCE
## FOR COURT OF CRIMINAL APPEALS

My name is Thomas Lee Evans and I am before the Court of Criminal Appeals today to share this Affidavit Of Due Diligence in support of my defense against the allegation of the State, and the Writ Judge's acceptance of the allegation, that my writ of habeas corpus application, presented under the T.C.C.P. Art. 11.07, was not timely filed, which prevents the State from addressing any of the issues raised there, and should be in all things denied because of that factor.

I am presently housed at the Wynne Unit, Walker County, Texas, and I swore under the fear of the penalty of perjury that following information is true.

\*     \*     \*

### Ineffective Assistance Of Counsel
### Primary Reason For Delay In Filing

The reasons for my delay in filing my writ are many, but they all fall under the primary fact that my court appointed trial and appellate counsels both failed me. Though declared indigent before and during the trial, the original trial judge, Judge Martin, of the 2nd/9th District Courts, took my indigency following my trial and insisted that I pay for my own lawyer and pay for the records to be produced. Even following a hearing to show my extreme poverty, the judge still refused to reinstate my indigent status, a stall tactic that set off a chain of events that lasted almost two years.

1

Trial counsel, Ms. Constance Luedicke, had never led a jury trial, though she had participated in a voir dire before. My case was very technical, with expert witnesses, and she was up against a very experienced team of District Attorneys. She fought under the defense that the evidence was factually insufficient to prove guilt, but Affidavits I now have prove that the D.A. and his witnesses lied in my trial, under oath, and that these lies, which are the only evidence to substantiate the allegations, went right over all of our heads. When the trial ended the judge took my indigency, and hers, off my case.

When the Court of Appeals finally made the judge give me a lawyer, the court judge assigned Jimmie Price, but didn't tell him of the appointment for about five months. (His letters to the Appeal Court are in the file I obtained from the Sam Houston Regional Law Library & Research Center over in Liberty.) Mr. Price had no knowledge of the October 1986 trial, yet he allowed a record to be produced that had been carefully edited and rewritten as to some key testimonies and did not have any of the exhibits made part of the file. This guy did not confer with me, did not allow me to see the records (I would have known then, if he had), and one day I simply received his brief showing a single error raised. I have the appeal file showing two letters to them, one of which complains, in my own uneducated fashion, that he failed to address my actual innocence claim. They did not help me. I have sense learned that Mr. Price did not file his only error correctly, nor did he address the other issues I raised in my writ under ineffective assistance of court appointed appeal attorney. Since he was not even notified of his appointment until about five months later, the time for filing the New Trial Motions had passed.

*  *  *

## To Become A Lawyer

In a due diligence case like mine, it comes down to the amount of time it has taken me to learn the law, and get possession of the facts that proves that the only evidence the State could manipulate before the jury and judge, was false testimony given under oath. Though unskilled, and with a somewhat

2.

slower ability to comprehend the meaning of the various laws, I have managed to do what my attorneys refused to do. It's not the best but at least I tried. I'm sorry that I couldn't learn quicker.

The guiding factors and fears that effected the "time" it has taken me are as follows:

#1. In Texas, we have a writ of habeas corpus system that assures the convicted that there is no time limit for filing, but then deep into my quest I learn that this fact is misleading, and that time it takes one to perfect the law can bar them from actually utilizing the writ beyond filing a piece of paper, as the State just showed me by having the Judge send me away following a weighing of evidence I was not even allowed to comment on.

#2. To add to the pressure of forcing an uneducated dishwasher and food server to become an attorney, I read that every issue I intend to raise must be raised the first time, because there are no two bites at the apple. I am still not raising all of my issues because I'm still confused by exactly what can be raised in a writ, and what can be raised in an appeal. I was praying that a new appeal would be granted and that I could have a real counsel help me in that.

#3. I will not reiterate appeal counsel's actions here, but all of what I have gone through is because he didn't stand up and do what was right from the beginning. This is a smart fellow and I can't imagine him not knowing that he was not representing me on my first appeal as an advocate.

#4. When I tried to get the items to prove my innocence, the trial testimonies, the photos proving the impermissibly suggestive photographic and other identification procedures, the statements that contradicted trial testimonies, etc., I ran into a wall in Montgomery County. As the section of this affidavit titled "Chronological Table Of Due Diligent Events" will show, they beat around the bush, sent me to other places, refused to give me what I asked for, tried to sell me stuff I didn't ask for, responded but failed to answer my questions and often just ignored my letters altogether. The Clerks once told my mom that all the appeal files were lost,

3

sold her $54 worth of papers she found in the D.A.'s file. Some of the letters, as I mentioned, were not copied at this early stage, but 2 of them were retained by the Appeal Court, and when I eventually had a new Appeal Court Clerk send me to the Sam Houston Regional Law Library + Research Center over in Liberty, they had 2 of my letters in the appeal file I bought for .60 a page. (There may be others I can locate if required.) Equipped with the appeal file, and the trial testimonies the appeal attorney allowed to be filed, I had numbers and names of people and places I could ask for documents to help prove the facts. Some helped and others didn't.

#5. Having learned through an inmate that I have to eventually file a writ to have my case heard I began to do research by reading any cases I could find. Most, obviously, did not relate to my situation, nor had they been reversed if they were similar. I eventually ran across a reference by a Judge to Erismav's Reversible Errors and my mom found me a used copy off of ebay. It had some things missing and stopped its supplements at 2000, but many of my issues had been thoroughly covered by the various courts before then. I eventually found a case that easily explained the Factual Insufficiency of the Evidence balance, and thus equipped I began putting all of the facts down and contacting places in search of legal help. None helped me, period, but built up my hopes and left me hanging there. (Innocents Projects are a big part of the delay because we automatically think they are going to seek justice at all costs. They don't. The last place who recently wrote me stated that they would get around to me in about 18 months. I threw the letter away.) Another place scammed my mom out of $395.00.

#6. When the DNA testing papers were handed out in here I put together a motion to have the two stains and the hairs tested. (Remember, <u>none</u> of them <u>matched me</u> in <u>1986</u>.) Now the "two" had multiplied, but not willing to believe the State or its followers would tamper with evidence, I allowed for the testing. It matched, but with no explanation about odds (numbers) when the DNA is that of a relative, I instigated having my father tested. (Then he died.) I also have on

affidavit questioning all of the evidence based on lapses in the time and manner in which it was handled, tape cut, etc. My goal is to NOT go to a new trial but to engage the State in a meaningful plea - to avoid the effects of a trial on my family and the complainant.

An attorney, Mr. Canlas, who assisted me for a time with the DNA request, wrote a letter to me after reviewing the trial testimonies and the lack of exhibits and questioned how an appeal attorney unfamiliar with the trial would allow an incomplete record to be produced covering the punishment stage only. This is one of the most honest people I have met.

#7. Because of my inability to decipher the technical jargon associated with the D.P.S. testimonies and papers (and my need for a DNA test to prove once and for I didn't do this) I contacted a writer, who happens to have been one of this nation's greatest forensics experts, Mr. Larry Ragle. He reviewed my papers pro bono from a 1986 perspective, and gave me an affidavit for DNA testing. It was through his "second" affidavit and the letters preceding it, that the D.P.S. chemist lied in my trial, that I was excluded as the owner of the hairs was back then (they, the police, did no follow up, it was me or nothing) and that the only link to me was that I was a male person.

Mr. Ragle said that I should have had the right to the Hair Specialist as my witness, but he never showed up for the trial. I found another case Cole v. State, 839 S.W. 2d 798 (Tex.Crim.App. 1992), with the same exact thing happening with the same exact guy, Mr. Snyder, not showing up for trial. That case was reversed.

In relation to the above Cole case, in which Mr. Snyder also failed to show for the trial, in relation to the State's claim today that it can't possibly respond because of the lateness of my writ, I would ask, how hard is it to look at the file,

5.

note that Mr. Snyder was subpoenaed, the sub. came up missing from the file, the D.A. stepped up to say he didn't know anything about the missing sub. but that our witnesses were "on call" and that he planned to have them on as his witnesses? My witnesses then became state witnesses, and the only one to show up gave false testimony about the findings of the other. (Law enforcement officers, such as D.P.S. people, are not allowed to do this.) Then, compare my affidavit by Mr. Ragle, and agree that I had the right to have the D.P.S. Hair Specialist, Mr. Snyder, there to testify in a light favorable to me as to why he excluded me as the donor of all the hairs found in the complainant's bed? (She swore under oath that no person had been on her bed in about 2 years.) Does this violate my right to a fair trial? Should the appeal attorney have raised this? No matter how old the case is, these facts, along with my affidavit from Mr. Ragle, is easily proven. All Mr. Ragle has done for me is explain the stuff I could not understand. Verify it through some other nuetral party. Once you know its wrong it is obvious.

#8 The DNA test devestated me but, with the chemist's failure to define the odds (ratios) with a relative is also a suspect I began to search for a way to have my father tested. When the test came back I was more determined to do this than ever. I had a envelope with his DNA on the flap but his death made it hard for me to justify. I simply couldn't figure out how to do it.

My reason for this way of thinking are many. My father molested my sister, then molested my cousin's daughter (step-daughter). When he visited me he referred to the complainant as "that bitch" and "the bitch" as if he knew her and her character for lying. Her original statement was of a red haired (curly haired), with several days growth of beard, 5-9 etc. I was 6 foot, blond hair and blue eyes, skinny, and could not grow a beard. She first

6.

said her assailant was in his late 20s, but then as the officer started questioning her based on his belief that I was the suspect she changed the description to between 18-20. (My father and I look young for our ages.)

All of the above takes time to recover from and decide what to do next.

#9. In November 2009 I met a Mr. Curtis Cook who had worked in the eye-examination field for about 45 years or so. I asked him to review my trial testimonies and he agreed to do so pro bono. He wrote me an affidavit on Jan. 6, 2010 stating that the State's so-called expert was lying. She swore under oath that the glasses found at the crime sieve were a perfect match for me. Mr. Cook pointed out to me that Ms. English gave one prescription on Direct that was different than the one given on Cross. His question was, "Which is it? It can't be both." Nobody in my trial questioned the integrity of this "master" of her field. Mr. Cook, however, pointed out to me that he believed the D.A. had lied to the Judge and my trial lawyer when describing her as an expert.

#10. Slow as I am sometimes, it finally dawned on me to write the Board of Medical Examiners to see if they had a listing for her back in 1986, and they wrote back and said they had no listing for her on any level of the field. Texas Medical Board letter is dated March 6, 2014.

*    *    *

## CONCLUSION OF YEARS OF RESEARCH

I had by this time accumulated about 100 lbs of paper (4 bags) and it was time to try and weed it all down to something that would fit in the 50 page rule. It wouldn't so I had to get rid of any issue I feared would be ignored because it should have been filed in a writ. If you will consider the time from my most powerful pieces of new evidence you will see that it really hasn't been that long: Forensics Expert, Larry Ragle's Affidavit, Jan 31, 2008; Mr. Curtis Cook, Eye Examination

Expert, January 10, 2010; Texas Medical Board, March 6, 2014. My writ was filed October 29, 2014, about seven (7) months from this last entry. The County sat on the writ until June 29, 2015, which was out of my control.

* * *

### Ex parte Smith, 463 S.W. 2d 185
### (Tex. Crim. App. 1471)

In Smith, above, the Court acknowledged an individual's shortcomings, and the inability to act because of those shortcomings, in relation to an ineffective assistance claim, as follows: "Where, at time of indictment was returned against him, petitioner was 18 years of age, was indigent and inexperienced in legal matters, and petitioner recieved no advice from his court appointed attorney, or anyone else, with reference to his constitutional and legal rights in a criminal trial, petitioner was entitled to habeas corpus relief on ground of ineffective assistance of counsel. (Texas Code of Criminal Procedures, Article 44.2)."

In my case, at time of indictment I was 19 years of age, was indigent and had never been a jury trial, with scientific evidence, and I recieved no advice from court appointed counsel, or anyone else, with reference to my constitutional and legal rights in a criminal trial of this nature, and I had to come down and learn the law on my own. I had about a 7.9 grade average and a GED. I was put on the most violent unit in the T.D.C.J. where I was beaten, raped and forced to work all day. I literally was learning the law to live, and no amount of State speculation can change the fact that I would have filed my writ years ago if I could have. I'm here today, at this time, because counsel failed me and it took me all these years to learn what I know. It has been learn or die since day one.

8.

\* \* \*

Ex parte Jordan, 879 S.W.2d 61

(Tex. Crim. App., 1994)

Please note the dates of the evidence to be located in this 1994 case. In Jordan the court held that the petitioner was entitled to relief with respect to his claim that counsel was ineffective for failing to investigate the validity of a prior used for enhancement purposes at punishment phase of his trial. The prior was from 1959, (about 36 years past), in another state, Louisiana.

I raised the same exact issue, but for a different background reason, and my priors are from 1984 + 1985, from Harris + Montgomery Counties.

\* \* \*

Carlos Trevino v. Thaler

(U.S. Supreme Court, May 2013)

In this Trevino, U.S. Supreme Court ruling, in a 5-4 ruling the court decided to hear an ineffective assistance case for the first time in a Federal Writ, though not raised on appeal out of Texas. I put this here because of the statements made by the Justices regarding Texas appeal system regarding ineffective assistance claims, because the rules of Texas procedure made it virtually impossible for him to raise that issue during an appeal in state court, and that a system like that of Texas does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel in an appeal.

What if, as in my case, it is a claim against both counsel for trial and appeal? I love our state and the Great Writ, but learning to use this system is a long, difficult process. I'm not a complete dummy, but what of the guys who are? There's no help coming, ever.

\* \* \*

9.

<u>I Here Address State + Judge</u>
<u>Reasons For Denial</u>

On June 26, 2015 the State filed its own "State's Answer To Application For Postconviction Writ Of Habeas Corpus," and it filed one for the Writ Judge titled, "Findings Of Fact And Conclusions Of Law." This last one they made for the Judge was signed June 29, 2015.

<u>Objection To Ruling</u>

This is a Due Diligence Affidavit presented here because the Writ Court did not allow me the chance speak and present evidence in my own behalf. I was barred from the hearing so all I can do now is address the issues the State and Writ Judge made on these papers, which do not prevent them from addressing my writ issues.

*　　*　　*

<u>Richards v. Quarterman,</u>

<u>578 F. Supp. 2d 849; 2008 U.S. Dist. LEXIS 66,221.</u>

The facts in the <u>Richards</u> case are exactly like mine: I filed my writ on October 29, 2014. The State created its own "State's Proposed Designation Of Issues" and one for the Writ Judge titled, "Designation Of Issues," on November 21, 2014. The Judge made his an Order on November 24, 2014. The Judge's order clearly state's that he has considered the application, and the file in the case, and finds that <u>all</u> of my effective assistance of counsel claims on appeal, should be resolved. To resolve these fact issues he Orders appeal counsel to provide an affidavit in 30 days. After 118 days I file a motion requesting an attorney to help me with the case and ask if counsel has decided to violate the 30 day order. The appeal counsel then produces an affidavit claiming no memory.

10.

Then, on June 26, 2015, the State files two more documents, its own "State's Answer To Application For Postconviction Writ Of Habeas Corpus," and one for the Writ Judge, "Findings Of Fact And Conclusions Of Law." The Writ Judge signs his as an Order on June 29, 2015.

As in the Richards case, the Writ Judge is different than the trial judge, the appeal counsels' affidavit is the only piece of evidence outside of the record allowed in to the hearing, and <u>I was not allowed to participate or show all of the evidence I'm showing here</u>. In the Richards case the higher court called this system for denying a charade.

*   *   *

The issues in the State and Judge's forms, made by the State, show the following reasons for denying my application. I would address each of them because the each claim to be a problem because of the lateness of my writ filing:

1. Court Appointed Appeal Counsels' Loss Of Memory: As was expected, counsel has lost his memory about everything related to my case. I can't even begin to understand how he can say this and that it's my fault. I am here because of him, for the most part, and his lack of memory does not alter my accusations as proven in the trial records, the case law + U.S. + Texas Constitutions, and my Affidavits in support.

2. The State claims that the Clerk claims (no affidavit in support of this statement) that the reporter's record from the applicant's trial is unavailable, and has not been in the clerk's possession since at least 2008. They can buy, as I did, the entire Appeal File, with the trial testimonies the Appeal Counsel filed, from the Sam Houston Regional Law Library + Research Center over in Liberty, Texas, as did I for .10¢ a page. Is the State suggesting that this is inadequate for a writ hearing but okay for my appeal? Again, I don't know how I can be held

11.

accountable for her copy. It is my understanding nothing is to ever be lost or destroyed. In my writ issues against counsel, I quoted the page and line numbers, and the facts outside the record were included in the Affidavits + the Medical Board letter, which were included. These are facts that can't be denied, no matter how much time has passed.

3. The State claimed that I did not offer any excuse as to my delay in filing the application, yet I did. On October 29, 2014, the Clerk received my application and everything in support of my claims, made copies of them and returned them to me. This are as follows:

A. Letter To Clerk. Ask her to please file all documents and send copies to the D.A.

B. To Writ Judge. Asked permission to file Writ.

C. Motion For Hearing To Determine Findings of Facts + Conclusions of Law.

D. Motion Requesting "Order" To Parties To Produce Documents.

E. Affidavit Of Indigency.

F. Writ Application Under T.C.C.P., Article 11.07.

6. Memorandum's Introduction Page; Table of Contents (page iii shows my Exhibit #4, Affidavit Of Due Diligence, T. Evans (11-pages) which covers my due diligence issue); and Table of Authorities By Ground Number.

H. Applicant's Memorandum, 50 pages as is the law.

I. Appendices Contents Page, which shows six items: ¹· Appendices Contents Page; ²· Applicant's "Inmate Declaration," T. Evans, (1-page); ³· Exhibit #1, Affidavit, Mr. Cook, Optometrist, (5 pages); ⁴· Exhibit #2, Texas Medical Board Letter, (2 pages, letter + envelope; ⁵· Exhibit #3, Affidavit, Mr. Ragle, Forensics Expert, (22 pages); and ⁶· Exhibit #4, Affidavit Of Due Diligence, T.L. Evans, (11-pages.) (A turn to 6A shows my title page for this item attached to the item.

A1, A2, A3, A4, A5, A6, are there, as described above. Item 6A is clearly identified in two places and is found on page 6A. I addressed

12.

issue of the laches. I don't know why the State claimed I made no offer to explain the issue. Did they lie? Did the Clerk again lose a writen?

\* \* \*

As this Affidavit Of Due Diligence For Court Of Criminal Appeals has covered the issue, I now believe that the issue of laches has now become one of controversy that needs to be resolved. As I have raised the case law of Richards v. Quarterman, 578 F. Supp. 2d 849; 2008 U.S. Dist LEXIS 66221, I believe the issue could be more readily addressed in a fair hearing, with counsel, where both sides are heard, not the State alone.

\* \* \*

## CHRONOLOGICAL TABLE OF DUE DILIGEN EVENTS

| EVENT: | BRIEF SUMMARY: | DATES: |
|---|---|---|
| 1. Trial Ended | Judge Took Indigency + Lawyer | 10-23-86 |
| 2. Begged Trial Counsel For Help | On 29th Day She Forged My Signature To Notice | 11-21-86 |
| 3. New Trial Motions | "No Counsel." Time Expired. 30 days | 11-22-86 |
| 4. Trial Counsel Letter to 9th | "I'm Not Appeal Attorney," / Requested Indigency Hearing | 2-3-87 |
| 5. Trial Counsel To Trial Judge Letter | Indigent Hearing Request / Signed Her Name As (H), no signature | 2-3-87 |
| 6. Indigency Hearing Results | Judge Martin Denied Again (Stall Tactics) | 3-30-87 |
| 7. Trial Counsel letter To Me | "I'm not your lawyer" / Get Help On Unit / Other Inmates.? | 5-7-87 |
| 8. My letter To Appeal Clerk | I can't produse S.F. / Judge is prejudiced for counsel objections | 5-13-87 |
| 9. 9th App. Court Orders Ind | 9th Court Ordered Judge Martin To Give Indigency. | 6-3-87 |
| 10. Appeal Counsel Notified | Counsel Checked Record and Had Been Assigned Was Back In 2-9-87. (5 months) | 7-6-87 |
| 11. Extension Of Time /SF | Reporter Now Pregnant / Extension Unt.! 11-30-87 | 7-28-87 |
| 12. 2nd Ext. of Time /SF | Now she's backed up / Extension Unt.! 4-1-88 | 11-23-87 |
| 13. S.F. Filed | I learn In July 2002 It's Edited + Has Exhibits Missing | 3-28-88 |
| 14. Extension Of Time | To File Appeal Brief / Ext. July 28, 1988 | 4-22-88 |
| 15. Brief Filed | One Error + This One Not Raised Correctly | 7-28-88 |
| 16. State's Exten. (Due 8-22-88) | Asts for 2 days (8-24-88) but files Request 8-26-88, 4-days late | 8-26-88 |

13

| EVENT | BRIEF SUMMARY | DATES |
|---|---|---|
| 17. My Letter To App Clerk | Complain of lawyer's error, Failed To Raise My Actual INOC. | 9-2-88 |
| 18. 9th Court App grants Ext. to State. Granted 9-7-88 | | 9-7-88 |
| 19. Ninth App Court Decides | Judgment Affirmed | 11-2-88 |
| 20. Motion For Rehearing | Still Does Not Argue Error Correctly | 11-16-88 |
| 21. Motion For Rehear | Overruled | 11-22-88 |
| 22. P.D.R. Court Crim. App | Submitted The Same Incorrect Argument #1382-88 No. | 12-8-88 |
| 23. P.D.R. | Refused | 2-22-89 |
| 24. P.D.R. | ORDER, Final Ruling, Refused 3/10/89 | 3-10-89 |
| 25. Attempts To Get Records | learned of error, Tried to get Records, started Reading Random cases, wrote Austin State Law Library, County + Appeal Courts, NOTHING clerk called around, no file found. Not knowing if they gave up or awhile, what can I do when they throw it all in Trash? | 89 thru 93 |
| 26. Desperate, Sent Mom To Court | Mom went to County Clerk, Sold her pages from D.A. File / NO S.F. | 94 thru 2001 |
| 26A. State Counsel For Offenders | will not assist / time cut off 500 | 11-21-2001 |
| 27. Austin Law Library | said try again at 9th Court App | 9-27-01 |
| 28. 9th Court App (M.S.)(Flores) | New Clerk said. Ordered sent to Sam Houston Law Library in Liberty | 5-30-02 |
| 29. Mom Paged | .10¢ a page in Liberty | 6-24-02 |
| 30. Received S.F. | Found out edited + exhibits not included for appeal / Don't know what to do | 7-12-02 |
| 31. Austin Law Library | Returned their "satisfaction card" Records edited, why? | 7- 02 |
| 32. Liberty, TX | Record on edited / why? / Wrote me it's all we have." | 7-17-02 |
| 33. 9th Appeal Clerk (M.S.)(Flores) | Records edited / but now I have #s and places I can write | 7-17-02 |
| 34. Mont. County J.D. Division | Request Investigation Info. | 8-24-02 |
| 35. Investigator Carlisle Responds | Prices, List | 10-16-02 |
| 36. Mom Bought | Got what they had | 10-20-02 |
| 37. Renewed Request | For Missing Portions | 2-6-03 |
| 38. Carlisle Replied | No Help. Refused. | 2-10-03 |
| 39. Mont.Cout, Records Division | Asked for all of it. | 8-24-02 |
| 40. Response | Lt. Young denied. | 9-4-02 |
| 41. Renewed Request | Renewed Req. to Young | 9-13-02(?) |
| 42. Response by Stroud | Lt Young changed job / Stroud denied. | 4-10-03(?) |
| 43. DPS Assist. General Counsel | (Houston Lab, Request for results) | 01-4-02 |

14.

| EVENT: | BRIEF SUMMARY: | DATES |
|---|---|---|
| 44. Response Austin DPS | Denied | 12-3-02 |
| 45. Requested again/Austin | D.P.S. | 1-28-03 |
| 46. Responded/Ass. Gen Counsel | Approved | 2-13-03 |
| 47. Reviewed my request | 30 days / DPS Records Dept. | 3-10-03 |
| 48. Recieved | they waived the cost | 3-21-03 |
| 49. Thank you letter | D.P.S. | 3-27-03 |
| 50. Houston Lab | Back of Forms Missing + Addresses Missing | 4-23-03 |
| 51. Mr. Rayle/Forensic Expert | I wrote him Asked permis. to write PRO BONO! | 4-30-03 |
| 52. Mr. Rayle Responds | Permission to write / send documents | 5-31-03 |
| 53. D.P.S. General Counsel | Refuses all help | _-_-03 |
| 54. County Clerk | Request Renewed / Reporter Notes / All trial info | 8-21-02 |
| 55. County Clerk | 60 days / I ask again | 10-22-02 |
| 56. Deputy Response | Price for Statement of Facts [They know what I want! I already have the S.F.] | 10-28-02 |
| 57. Request Priors "into" | Cost etc. | 4-9-03 |
| 58. Response from Salazar | $13 | 4-16-03 |
| 59. Wrote Mom | She payed $13 / enclosed letter asking about notes again | 4-30-03 |
| 60. Staff Counsel For Defenders | Mr. Brothers won't help me. | 5-5-03 |
| 61. County Clerk | I recieve priors info / said write reporter for notes (clerk is right did it) | 6-9-03 |
| 62. Wrote Reporter | At her home address / Returned to sender | _-_- |
| 63. Wrote Appeal Counsel | J. Price / asked for help + documents | 4-9-03 |
| 64. Wrote Appeal Counsel Again | No response | _-_- |
| 65. Trial Counsel/Ms. Luedtke | She responds no memory (her first trial!) | 5-19-06 |
| 66. Eye glasses into/Walls Unit | Asked for test results. | 10-22-02 |
| 67. Ramsey Unit Eye Clinic | Sure thing. | 1-9-03 |
| 68. Eye Clinic/Ms. English | State's so called expert / copy of results etc. | 1-9-03 |
| 69. Classifications T.D.C.J. Records | Ms Armand testified @ biz doc. (same thing) | 1-9-03 |
| 70. Stiles Unit Medical Records | Eye glasses into. | 1-29-03 |
| 71. Stiles Unit/MRT Ms. Joseph | same request | 2-27-03 |

15

| EVENTS: | BRIEF SUMMARY: | DATE: |
|---|---|---|
| 72. UTMB Health Care Response | (I didn't write them) | 3-6-03 |
| 73. Medical Records (Stiles Unit) | MRT Ms Joseph, went to Federal Prisons to work) | 3-15-03 |
| 74. Sick Call Request | Review Medical Records | 3-29-03 |
| 75. Health Services/Notices | Same thing / I want #s not glasses | 5-8-03 |
| 76. County Clerk Salazar | Sent copies 12,961-A-CR/said "notes" filed w/ clerk | 6-2-03 |
| 77. Pam Payne/Records/Research | What case was "dismissed" on 10-27-86 | 12-2-10 |
| 78. Her Response | Sent Docket Sheets/My Prior U.U.M.V is somehow turned @ Tdcj. | 8-6-05 |
| 79. Jester II Unit (was pre-release in '86) | My release date 3rd or B.K.? (never responded) | 6-14-05 |
| 80. wrote Mr. Ragle, Exp. Forensics | Will help me on everything | 12-1-03 |
| 81. Wrote Mr. Ragle | More Questions | 3-15-04 |
| 82. Ragle Responds | Answered me | 4-4-04 |
| 83. Affidavit, Mr. Ragle | Everything, notorized, etc (thank you letter) | 1-31-08 |
| 84. Reporter's Notes | Again tried to contact Reporter | 4-27-04 |
| 85. Clerk Responds Again | Same runaround, Never a direct answer. | 1-5-05 |
| 86. Staff Counsel For Inmates | Asked for help/Ms. Martinez | 3-3-03 |
| 87. Inn. Coalition | Ask for help with Writ/It's too much | 4-26-04 |
| 88. Response | Doesn't do writs. | 7-12-04 |
| 89. Met Mr. Cook, Optometrist | Asked him to read trial rec/agreed pro bono | 11- -09 |
| 90. Affidavit from Mr. Cook | States D.A. + Ms. English probably lied | 1-6-10 |
| 91. Florida International University | USA Today Article Dr. Fisher/Study for Justice Dept/Experm. Sugg. Photo I.D ok | 9-2-04 |
| 92. He wrote back. | Gave me permission | 12-20-04 |
| 93. U.S. Postal Service/Dallas | Said he destroyed all my papers | 1-14-05 |
| 94. Dr. Fisher | see if he got them anyway (no way.) | 1-17-05 |
| 95. Dr. Penrod/Johntay College | Same as Fisher, I.D. study/no response | 9-2-04 |
| 96. Dr. Wells/Iowa State Univ. | Same thing Fisher, I D study/no response | 9-2-04 |
| 97. Drs. Davey + Behrman/Cal. State | Same thing Fisher, I D study/no response | 9-1-04 |
| 98. Harris County Clerk | Need prior to prove dates etc. | 4-4-05 |
| 99. Harris County Response | Denied, gov. code 552 | 4-13-05 |

16

| EVENTS: | BRIEF SUMMARY: | DATES: |
|---|---|---|
| 100. Harris County | My Response to 551/doesn't apply (No response) see if they recorded trial during Judge Martin's INV. 10-23-86 | 4-15-05 |
| 101. Wrote Justice Dept. | Responded 6-23-05 that I should seek local help (FBI?) | 5-2-05 |
| 102. Blackstone Law School | Can they loan me $ for classes / I need to learn | 6-10-05 |
| 103. Blackstone's Response | No loans. | 7-13-05 |
| 104. INNOC. Project | Help me. | 7-5-05 |
| 105. INNOC Project | Help me. | 10-10-05 |
| 106. INNOC. Project | Help me. | 11-4-05 |
| 107. INNOC Project | Help me. | 4-1-06 (?) |
| 108. Attorney/Ms. Stephens | No help/suggests 2 writ writers (NO#) | 11-6-03 |
| 109. Court App. Investigator | Located my alibi witnesses is 86 Jack Daniel's Legal Support Services (No Response now) | 12-29-03 |
| 110. Forensics Help | uni-stat/hair, semen, etc/help read-too many technical terms | 12-22-03 |
| 111. Lawyer/Ms. Holland | Moved/Return To Sender/Writ help request. | 12-22-03 |
| 112. Legal Services (11-07 hlp) | Ms. Lovelace/No response (No more Guessing or manipulating case law) | 12-29-03 |
| * 113. Erisman's Reversible Errors | More bought off of Net /Helped big time # | 2-3-04 |
| 114. Polygraph Request | Request Places/Classes for "free" test | 12-29-03 |
| 115. Board Responded | Not Authorized To Suggest, etc | 1-14-04 |
| 116. Polygraph Request | Knowlton + Associates/Cost $/No Response | 4-26-04 |
| 117. Staff Counsel Again | Ms. Martinez (Book says they help us. A lie.) | 3-19-03 |
| 118. Staff Counsel Again | Ms. Martinez (Her friend wrote/Not helping) | 4-3-03 |
| 119. Court Reporter/Trough Clerk | Correct notes please | 1-2-03 |
| 120. Harris County | To prove prior wrong dates, etc. | 4-9-03 |
| 121. Harris County | The prior. | 6-11-03 |
| 122. Harris County Response | 2005 letters "Cancelled" all help (4-4-05) - - - - - | 4-7-05 |
| 123. INN. Project | Won't help with Writ or Lie Detector tests | 7-12-04 |
| 124. INN. Project | Houston/help | 11-4-05 |
| 125. INN. Project | Houston/Dr. Daw/Help | 3-27-06 |
| 126. INN. Project | Ms. Taylor (No Help) New York | 3-31-06 |

17.

| EVENT: | BRIEF SUMMARY: | DATE: |
|---|---|---|
| 127. T.W.O.C. Project | B. Scheck / Asked for help | 11-29-10 |
| 128. Lawyer George Parnham | Free help please / Same as his other case - lying witness | 12-21-10 |
| 129. Parole Division, Montgomery, Co. / Wanted proof that my "U.U.M.M probation now" Theft | 1-10-05 |
| 130. Houston Chronicle | Ask writer for help. | 12-3-10 |
| 131. HALO Investigators | Justice Dept. ordered someone to invest. Judge Mallory. Who? Price to locate name/office of person who investigated J. Mallory | 1-12-12 |
| 132. Response HALO ↗ | A recording would show my trial testimonies. Can do it for $250. For an address! (I have no $) | 10-9-12 |
| 133. Halo Followed up | Wants $250 for an address. | 1-16-13 |
| 134. Mr. Bourque (Christian Lawyer) | Will he help? No $. Purchased all papers for Ide, Po.) | 2-6-13 |
| 135. Montgomery Clerk | Request for documents | 1-17-05 |
| 136. Monty. Clerks | Asked for Docket Sheets in U.U.M.V. | 5-10-05 |
| 137. Monty. Clerks ↗ | Bought some / requested others / (Exhibits) | 6-13-05 |
| 138. Response | Said Exhibits in Reporter's notes / he never filed in App. Record. | 6-24-05 |
| 139. Manifest Now Obsolete | Veridico Network, Inc. (Scam Artist) | |
| 140. Wrote me | Offered help with a lawyer for $395 | 2-11-13 |
| 141. Wrote mom | She payed $395 | 2-16-13 |
| 142. They wrote | Form letters / doing nothing | 3-17-13 |
| 143. They wrote | Form letters / doing nothing | 5-16-13 |
| 144. They wrote | Form letters / doing nothing (Realizing it's a scam) | 7-1-13 |
| 145. They wrote | Form letters - Trash (Stole my mom's $) | 3-3-14 |
| 146. Wrote then again, | this time send mom's money to her | — |
| 147. Write / Bet. Biz. Bear. (For next people they scam | | — |
| 148. Court of Crim. App. | Book said my out of Time P.D.R (writ is done.) | 9-8-14 |
| 149. C.C.A. Response | Mine on same issue / he did it wrong. App. lawyer's P.D.R. filed 1988 / No others allowed | 9-17-14 |
| 150. Montgomery County Clerk | Grand Jury Minutes / Mr. English Testify / Did D.A. lie to them? | 7-30-14 |
| 151. Monty. County Clerk | I asked for specifics | 7-26-14 |
| 152. Response Harvey | Said $1 per page, but not page count! | 8-1-14 |

18

| EVENT: | BRIEF SUMMARY: | DATE: |
|---|---|---|
| 153. Clerk Resp./Williams | $5 fee to "research the issue" | 8-15-14 |
| 154. Texas Medical Board | Answers 1986 inquiry (no listing/period for N. English) (Mr. Stover lied to us.) | 3-6-14 |
| 154. State Bar | About D.A. Mr. Stover lying | 3-13-14 |
| 155. State Bar | Said I failed to name a lawyer (thought he was a lawyer) | 3-27-14 |
| ★ 156. Filed Writ 11.07 | Sent Clerk Writ/Med. Board letter/Forensic Affidavit/Cook's Affid./My Affid. | 9-29-14 ★ |
| 157. She Filed It | Filed writ/motions/Affidavits/Etc/Stamped + Returned Copies | 10-29-14 |
| 158. State Files | 1. "State's Proposed Designation of Issues" 2. Judges "Designation Of Issues" | 11-21-14 |
| 159. Judge Signs | Judge signs the one filed for her. (30 days for Applr. Aff.) Affidavit(?) | 11-24-14 |
| 160. I file. | Motion For App. of Counsel (118 days and App. Law. Fails to File) 1. Its own "State's Answer" to Applic. For Post Con. writ of Habeas | 3-22-15 |
| 161. State Files | 2. And Judge's "Findings of Fact + Concl. of Law" | 6-26-15 |
| 162. Judge Signs | Judge signs the one for her | 6-29-15 |
| 163. Notified by Clerk | She sent File to C.C. App. but (I received 9 days later) She sent me NO copies of what she sent (Was my Aff. included?) | 6-29-15 |
| C.C.A. 164. I file: | Court of Crim. App. (Don't know right procedures) Motion For Ext. of Time To Respond To Distr. Court's Blanket Den. | 7-8-15 |
| Distr. Court 165. I file: | District Court (Don't know right procedures) "Objection To Ruling" | 7-11-15 |
| C.C.A. 166. I file: | Motion to Respond Affidavit/Extensive Coverage of Due D.L. (Bad Clerk? Send all?) | 7-17-15 |

★ ★ ★

As mentioned, there were people I wrote without making copies, and sometimes I forgot to put dates. All of the above was because trial + appeal counsels failed me. In regards to this laches issue my Due Diligence is obvious. I'm not the smartest person in the bunch but at least I tried. Most important three entries show dates not that long ago and they are critical to the State's case and my claim of actual innocence. Had this information been made to trial and appeal counsels, and had they not been court appointed, the outcome of guilt and sentence would have been different. From the moment of the letter from the Texas Medical Board stating no 1986 listing for the State's alleged Expert, March 6, 2014 until filing of the writ on September 29, 2014, is only about 7 months.

The only thing I could add to my investigation would be a transcription of the Grand Jury Hearing where I'm sure the D.A. Mr. Stover, ran wild, and

to locate the local agency who conducted the investigation of my trial judge, Judge Martin, in part during my 1986 trial, ordered by the Justice Dept., for his violation of an unrelated person's rights. I reason that investigators of this nature, record things. As some of Judge Martin's actions were in the Court Room I wanted to simply ask an investigator if they had inadvertently recorded my trial. That would prove that I'm telling the truth.

Thank you for your time and consideration in just reading this lengthy document.


Respectfully submitted,

*Thomas Lee Evans*

Thomas Lee Evans
TDCJ #435211/Wynne Unit
810 FM 2821
Huntsville, Texas 77349


## "Inmate's Declaration."

I swore under the fear of the penalty of perjury that everything in this Affidavit of Due Diligence is true and correct to my own personal knowledge. Today's date is: July 15, 2015.


Signature: *Thomas Lee Evans*

Thomas Lee Evans

## AFFIDAVIT

THE STATE OF TEXAS                     §
                                       §
COUNTY OF BRAZORIA                      §

BEFORE ME, the undersigned authority, on this day personally appeared CURTIS COOK, who by me duly sworn, upon oath deposes and says,

"I am CURTIS COOK. For nearly forty years I have been licensed by the American Board of Opticianary, and have worked within the field of opticianal practice at all levels of the trade. My complete professional credentials are included in my curriculum vitae, which is part of this affidavit.

1. Thomas Lee Evans contacted me in November of 2009, and told me that he had been in a jury trial, [Cause No. 19,180] in which a pair of glasses were used in his trial to link him to a crime. He asked me if I would review the testimony of a Texas Department of Corrections optometrist, a Mrs. Nanette English, and a Mrs. Denise Arnaud, a Texas Department of Corrections employee in charge of Medical Records. His objective was to verify or disclaim a statement by Mrs. Arnaud that a Comparison Test made by a T.D.C. employee for the police as part of their investigation, of the glasses found at a crime scene to a prescription form made while Mr. Evans was in T.D.C., was in fact "Records kept in the normal course of business of the Texas Department of Corrections"; and whether or not this Comparison Test was "Records that were made in connection with your official duties with the Texas Department of Corrections." I agreed to read his documents and give him an opinion, pro bono.

2. MRS DENISE ARNAUD, In Charge of Medical Records of the Central Region of the T.D.C.:

(a) Under Oath, Mrs. Arnaud stated that State's Exhibit #12, are "Records kept in the normal course of business of the Texas Department of Corrections,"(S.F. Vol. IV, page 400, lines 8-11); and that they are "optician records of inmate Thomas Lee Evans,"(S.F. Vol. IV, page 400, lines 12-25, thru page 401, lines 1-5); and specifically agreed with the District Attorney that, "these records that were made in connection with your official duties with the Texas Department of Corrections,"(S.F. Vol. IV, page 401, lines 6-9). It is revealed that the last page is the results of the Comparison Test made against the crime scene glasses against Mr. Evans' prescription while he was incarcerated in T.D.C.,(S.F. Vol. IV, page 408, lines 15-25, thru page 409, lines 1-12).

QUESTION: Is the Comparison Test made by a T.D.C.

-1-

employee for the State as part of its criminal investigation, a "Record kept in the normal course of business of the Texas Department of Corrections."

ANSWER: No. I have been associated with the opticianal field for about forty-five years and I never heard of an optometrist, or an unlicensed, self-proclaimed "Clinic Supervisor" in charge of "dispensing glasses," conducting an examination of criminal evidence and then holding a Comparison Test of those results to our records. The analysis of evidence and the Comparison Test are not part of our "normal course of business." The prescription made while Mr. Evans was in T.D.C. is, the analysis of evidence and the results of the comparison test are not.

Mr. Evans also pointed out to me that he was not in prison during this Comparison Test, but in the county jail. I don't see T.D.C. being in control of Mr. Evans in any way.

3. MRS. NANETTE ENGLISH, Walls Clinic Supervisor:

In addition to the above, I made several independent observations regarding the testimony of Mrs. English, a "Supervisor of the Walls Clinic of the Texas Department of Corrections"(S.F. Vol. IV, page 403, lines 18-20); whose job description is "I run the eye clinic there dispensing glasses" (S.F. Vol. IV, page 403, lines 23-24). The District Attorney, Mr. Stover, before the trial began during a pre-trial hearing, stated that she was an "ophthalmologist from TDC" and that she had "come down to testify and said it was the glasses prescribed to him and given to him while he was serving time at TDC." The Judge responds "Okay." Since the trial has not began yet, I presume she testified in a Grand Jury Hearing. (S.F. Vol. II, page 183, lines 22-25, thru page 184, lines 1-3). At any rate, I question whether or not Mrs. English is an ophthalmologist, a Doctor, qualified to make any observations. She made several statements to the lawyers that showed a lack of experience in the opticianal field, which in my opinion is misleading to the lay person, and would wrongly support the State's claim that these glasses were positively Mr. Evans'. She specifically states, "the glasses match the prescription," (S.F. Vol. IV, page 409, lines 8-12," as if she is an authority on the subject of testing a pair of glasses found at a crime scene, and then comparing that analysis to a known prescription. As I'll show, I have reason to believe that she is not an authority in the opticianal field. I also notice that the lack of opticianal knowledge by every person there, including the judge, allowed Mrs. English and the D.A. to introduce a false statement as if it were true. A truly skilled practitioner, such as I, could have easily discredited Mrs. English's testimony, or verified its authenticity.

(a) QUESTIONS FOR MRS. ENGLISH:

1. Did you test Mr. Evans while he was in prison? At (S.F. Vol. IV, page 404, lines 15-16) she states that

a "doctor" does the testing. At Page 406, lines 10-11,

-2-

she says that the Ramsey III Eye Clinic conducted the examination (another prison); and confirms the State's question of whether or not "the order actually issued was for the glasses that the doctor ordered for him,"(S.F. Vol. IV, page 408, lines 11-14); and then "the eye clinic actually ordered the exact prescription that the doctor had said?" "Yes, sir."(S.F. Vol. IV, page 407, lines 20-22).Who are these doctors? Are _they_ licensed? Is the document even authentic? I wouldn't question this but for the fact of this testimony being deceptive. (Her and the D.A. testifying as if she is qualified, an ophthalmologist (S.F. Vol. II, page 183, lines 22-25, thru page 184, lines 1-3) qualified to give a professional opinion, when she is obviously not.) If she will mislead the layman in this manner, then what else would she do?

2. The D.A. asked Mrs. English if she has a "machine" she can test glasses on and she says"yes."(S.F. Vol. IV, page 408, lines 18-21.) She then admits to testing the crime scene evidence on this machine and coming to the conclusion that these glasses were exactly the same as those ordered for him,(S.F. Vol. IV, page 409, lines 3-15).

My question here, is, what qualifies her to do a test of these glasses on a lensometer? Is she a licensed optomitrist? Where did she get her training?

3. Had she told me she knew how to use a lensometer I would have asked her to demonstrate the procedures. It would be easier for the unexperienced person to "say" they have made an exact finding than to actually recieve one by proper operation.

(b)OVERALL there is no "professional" analysis here, and the only "proof" I see here of "her" conclusion is her "own" opinion. The most glaring example of her inexperience is found on Direct and Cross-examination. When asked at (S.F. Vol. IV, page 406, lines 12-22) what kind of vision problem Mr. Evans had, she simply said "Myopic," which is a legitimate analysis, accurately defined as "nearsighted," which the D.A. defines as "he can see close up, okay, but can't see things far away." But, on Cross-examination at(S.F. Vol. IV, page 413, lines 14-25) she is asked the same question and states, "Myopia with an astigmatism" which is a completely different prescription. For example, a person with myopia could not even see through a pair of glasses of someone with an astigmatism. Which is it, myopic, or myopic with an astigmatism? And then she falsely defines this prescription as, "That means he's nearsighted, can see close up; but can't see far off. _An astigmatism reflected has to be put in to correct_ _different angles_," and Mr. Evans' lawyer says, "_Okay_." This is not okay. An astigmatism means an "irregular cornea," not an "astigmatism reflected has to be put in to correct different angles." Merriam Webster's Collegiate Dictionary, Tenth Edition, defines it as:"_Astigmatism:1:_ _a defect of an optical system (as a lens) causing rays_

-3-

from a point to fail to meet in a focal point resulting in a blurred and imperfect image. 2:a defect of vision due to a stigmatism of the refractive system of the eye and esp. to corneal irregularity. 3:Distorted understanding suggestive of the blurred vision on an astigmatic person."

Mrs. English's only attempt at technical jargon associated with my trade proved that she was not a skilled practitioner. Had a truly skilled optician been called upon by Mr. Evans' lawyer, such as I, to question Mrs. English, her inexperience would have been easily revealed and the outcome of the eye glasses testimony and the admissibility, would have possibly been much different. Nothing in this entire testimony convinces me that the glasses tested, if they were tested, were the exact same as those issued to Mr. Evans while in prison. I quit practicing two years ago after forty-seven years in the field, and I can in good conscience make this claim based on my own extensive qualifications.

* * *

# EMPLOYMENT Curriculum Vitae

## CURTIS COOK

## MASTER CERTIFIED OPTICIAN

### Education:

Apprenticed Under My Father, Beginning At Age Fourteen

Master's Achieved In 1979

American Board Of Opticianary

International Academy Of Texas

Certified Ophthalmic Association Of Texas

### Employment:

Self-emploed For Forty Years, Certified Optician's Office

\* \* \*

*Curtis Cook*

## INMATE'S DECLARATION

"I. under both Federal law (28 U.S.C. §1746) and State law (V.T.C.A. Civil Practice & Remedies Code, §132.001-132.003), CURTIS COOK, TDCJ #1585493, incarcerated at Ramsey One, in Brazoria County, Texas, declare under penalty of perjury that the foregoing INITIALED pages of this Affidavit are true and correct.

Executed on January 6, 2010. *[signature]* "

## AFFIDAVIT

THE STATE OF CALIFORNIA          §
                                 §
COUNTY OF ORANGE                 §

BEFORE ME, the undersigned authority, on this day personally appeared Larry Ragle, who being by me duly sworn, upon oath deposes and says,

"I am Larry Ragle. I am with the Center for the Forensic Sciences.

1.   My professional credentials are included in my curriculum vitae which is part of this affidavit.

2.   Thomas Evans contacted me by mail dated December 1, 2003. He had obtained a copy of my book, Crime Scene, Avon-Harper/collins, 1995. Evans indicated in his letter that he had read the chapter on serology, specifically the section on secretor status and ABO typing of semen samples. He asked if I would review the laboratory and police reports that he had obtained regarding his case. I agreed to review his documents, pro bono.

3.   I have reviewed several documents submitted to me for review related to Thomas Evans' case: a) Scene and Investigation Reports from the Montgomery County Sheriff's Office regarding case #86-14560; b)Texas Department of Public Safety Laboratory Reports-Case #L2H54833 (1) Serology Examination by Sondra Denney. (2) Hair Examination by Randy Snyder; (3) Transcript of Testimony of Sondra Denney at trial pages 365-389.

4.   The serology report by Sondra Denney of the Texas Department of Public Safety indicates the presence of semen by P30 but in a quantity below the sensitivity of the inderect ABO or secretor status techniques, used in 1986. There were two stains, however no attempt was made to combine them. No ABO activity (detection) is also explained when the sample is that of a non-secretor. Evans was determined to be a type A secretor, the victim a non-secretor. These results obtained do not implicate Evans in any way other than-he is male. This is an opinion based upon these 1986 results only. The ABO typing system is, today, totally obsolete for forensic purposes. At the time of Mr. Evans' trial it was the only test available. At best, ABO type, secretor status and PGM typing could exclude possible donors but could never be specific. In Evans' case, the results, as described above by the analyst, were inconclusive.

5.   In a March 15, 2004 letter to me from Mr. Evans he asked several questions that I answered in a letter dated April 4, 2004. The following background information, questions and



answers are excerpted from those two letters:

<u>Mr. Evans' Letter, 3/15/04</u>:

Page 2:

"NOTE: Nearly all of the following questions are critical of the procedures used by the officials mentioned. I can't help doing this. Though I would like to know your opinion based upon your full range of professional knowledge, in all fairness I have asked these questions with the limits in mind of the technology and understanding available to these people between June & October of the year 1986. These are the days between when the crime was committed and the trial's ending.

\* \* \*

"<u>Crime Scene</u>:

<u>Patrol Officer, Mr. Robert Paul Dunn</u>:

On the night of the assault, June 15, 1986, the first officer on the scene, (Mr. Robert Paul Dunn of the Montgomery County Sheriff's Dept.), interviewed the victim, (Ms. Maury Lynn Stryker), for about 20 minutes, and then escorted her and her friend, (Ms. Shirley Jordan), back to Ms. Stryker's apartment so that he could secure the scene, (S.F. Vol. III, page 315, lines 11-20).

Upon arrival they each noticed that the apartment door was open, and had been open for approximately 30 minutes. Officer Dunn told them not to disturb the door, (S.F. Vol. III, page 314, lines 21-24), and together the three of them entered the apartment and walked around to see what was out of place. During the course of their search they found several items of evidence inside the apartment, (S.F. Vol. III, page 324, lines 10-17), and after realizing that Ms. Stryker's purses were missing, found them outside the apartment by a sidewalk and some trees, (S.F. Vol. III, page 268. lines 16-25, through page 269, lines 1-18).

Sometime during this, a man showed up at the scene and claimed to be the apartment security. This person did not testify, and the fact that he was a black person, and his name, have been removed from the S.F.. I would also like to point out at this time that Ms. Stryker's windows were securde, the sliding glass door was secured and with spiderwebs on it, and she said that she always locks her door.

Though the S.F. has been edited for the most part of the following, Officer Dunn and Ms. Stryker both stated that Ms. Stryker was not bleeding or in any need of immediate medical attention. Though not in need of immediate medical attention, Officer Dunn left the crime scene in the care of this guy who is said to be apartment security, (S.F. Vol. III, page 344, lines 17-21). Though called, no other police were present at this

Page 3:

-2-

time, the door was left open, and there was two purses laying outside somewhere.

\* \* \*

Question 1: Should Officer Dunn have let Ms. Stryker and Ms. Jordan walk around the crime scene?

\* \* \*

Mr. Ragle's Letter, 4/7/04:

Answer 1. Re Dunn allowing Stryker and Jordan back into the scene. Answer: No. The scene should be examined and photographed first. After that, only the victim should be allowed to enter the scene, and then, just far enough to inform the investigator where events took place, what items are not hers, what has been moved or changed and what might be missing. In general, this is not a fatal blunder but certainly could compromise some investigations. A non involved person should never be allowed into the scene.

\* \* \*

Evans' Letter:

Question 2: Should Officer Dunn have left the crime scene in the care of this civilian?

\* \* \*

Ragle's Letter:

Answer 2. Re Dunn leaving a civilian in care of the scene. Answer: No. However, it's not a fatal error. See #3 below.

\* \* \*

Evans' Letter:

Question 3: Because the security guy was left alone with the evidence, does his place in the chain of custody of all the items of evidence matter?

\* \* \*

Ragle's Letter:

Answer 3. Re security guy breaking the chain of possession. Answer: He is _in_ the chain of possession if he had sole control of the evidence for a period of time. If the DA failed to call him as a witness, Mr. Canlas (or appropriate counsel) can explain better than I, how it effects the admissibility of all the evidence.

\* \* \*

Evans' Letter:

"Crime Scene Investigator, Srg. Noel Stanley:

In October of 2000, Identification Investigator, A.B. Carlisle, of the Montgomery County Sheriff's Dept., sent to me a copy of the enclosed packet I've tilted "Montgomery

-3-

File, 86-14560", which is 4-pages. He sent me a color copy of some pictures as well, but I spilled some water and two small dots landed on them. If I can't get a new copy I may have to send these.

On page 1, you will see a form made by Srg. Noel Stanley titled "Supplementary Investigation Report", dated 6-15-86 at the top. On this form Srg. Stanley states that he arrived on the scene at "3:15 a.m.", and that he "photographed the scene as he saw it". In the trial he states that another fellow, (Mr. Jerry Jackson), photographed the scene "at his direction", (S.F. Vol. III, page 356, lines 6-20; and page 360, line 25, through page 361, lines 1-12).

In this Supplementary Investigation Report, Srg. Stanley also states that he was contracted at "2:35 a.m." by the Montgomery County Sheriff's Dept. Dispatch, and that an Identification Officer was requested by Srg. Billy Rogers, to go to the scene. In the trial, the D.A., Mr. F.M. "Rick" Stover, is questioning the victim, Ms. Maury Lynn Stryker, about these photos, and after Ms. Stryker identifies State's Exhibit No. 7, which has a clock in it, she assures Mr. Stover "twice" that the time on the clock is correct and shows the time the picture was taken. The time is described as "2:30 something a.m.", (S.F. Vol. III, page 309, lines 11-25, through page 310, lines 1-3).

Needless to say, if Srg. Stanley was contacted by phone at 2:35 a.m., and arrived at the scene at 3:15 a.m., and the pictures with a clock showing the time to be 2:30 something a.m., is true, then Srg. Stanley did not photograph the scene "as he saw it", and the statement he gave in the trial that these 6 pictures were taken by Jerry Jackson "at his direction" is not true. In this case the crime scene was in the care of Mr. Jackson from at least 2:30 something a.m. until 3:15 a.m. At the very minimum Mr. Jackson walked around the crime scene taking pictures for 36 minutes.

* * *

Question 4: Does Mr. Jackson's place in the chain of custody of all the evidence matter, if he was there alone with the evidence for 36 minutes or more?

* * *

Ragle's Letter:

Answer 4: Re Jackson. Answer see #3. Anyone who enters the scene should be available as a witness. In California, the photographer may not be called if he didn't collect any evidence and an investigator testifies the photographs offered accurately represent the scene as it was first found. In this case however, if Jackson was underline alone and the scene was unprotected at first and later guarded by a civilian it may be an admissibility issue. Ask Mr. Canlas.

* * *

Evans' Letter:

-4-

**Question 5:** If Mr. Jackson is inside the apartment at 2:30 something a.m. taking pictures, then the purses are outside in the custody of this security guy, or not in anyone's custody if the guy left.

Should Mr. Jackson have left the purses outside in this person's custody? (This is the same thing Officer Dunn did.)
\* \* \*

**Ragle's Letter:**

**Answer 5:** Re the purses. Answer: Yes. The purses sjould have been photographed in place and the collected, protected and packaged. Carbon dusting doesn't always work on odd surfaces but procedures for locating fingerprints on almost any type of surface were available in 1986. Superglue (cyanoacrylate) is a simple procedure available in almost any location (for example, at the local police station or at the scene). Further, most state labs, by 1986, had some type of laser or alternative light sources for locating prints on almost any type of surface.
\* \* \*

**Evans' Letter:**

**Question 6:** Srg, Stanley is the one in charge of the crime scene investigation. Should Mr. Jackson have been walking around the crime scene alone, taking pictures, during the time Srg. Stanley was not there?
\* \* \*

**Ragle's Letter:**

**Answer 6:** Re Jackson being alone. Answer: Stanley or Dunn should have maintained control of the scene, however, Jackson I assume, is an employee of the PD. If so, I don't see an issue other than what I have already listed.
\* \* \*

**PURSES:**

**Evans'Letter:**

In Srg. Stanley's Supplementary Investigation Report, (Montgomery County File, page 1), he states:

"I picked up the victims(sic) <u>purse</u> and contents from outside the apartment next to the concrete walkway and put <u>it</u> back in the victim's residence."

He is talking about only "one" purse.

In the Statement of Facts, Ms. Stryker states that she, Ms. Jordan, (who is Ms. Stryker's friend), and Officer Dunn, returned to the crime scene, (which is before the above mentioned "2:30 something a.m." in the picture Mr. Jackson took, and before the "3:15 a.m." Srg. Stanley arrived), and they found

-5-

"both" of her purses outside, (S.F. Vol. III, page 269, lines 15-16).

The picture (State's Exhibit No. 10), of "two purses", one blue and one white, as "they" were found outside are discussed by Ms. Stryker again in (S.F. Vol. III, page 310, lines 22-25, through page 311, lines 1-5).

Ms. Jordan then testified that there was only "one" purse found, and she's looking at the same picture, State's Exhibit No. 10, (S.F. Vol. III, page 326, lines 2-11).

In officer Dunn's Direct, Mr. Stover, the D.A., refers Officer Dunn to State's Exhibit No. 10, and says "purse or purses", and then "purses", (S.F. Vol. III, page 344, lines 5-11).

And in Srg. Stanley's Direct, by Mr. Stover, the D.A., the D.A. asked if the picture actually depicts the scene of Ms. Stryker's apartment and her "purse" outside the apartment as Mr. Stanley saw "them" that night, (S.F. Vol. III, page 356, lines 17-21).

I can't remember if Srg. Stanley recovered both purses, or if one was missing, or what. I do remember that there was confusion about this, but not the specifics. It has also occurred to me that someone has further confused the amount by rewriting some of this trial testimony. (I know for a fact that this happened in other places, unrelated to this.) If I can ever get the correct, unedited trial testimony when I will be able to add to or take away from this question.

Though edited out of the record for some reason, I do remember that Srg. Stanley stated in the trial that he didn't attempt tp print the purse(s), because they/it was of a type of material that he figured wouldn't hold a print, and though believed to have been handled by the assailant, no field test for trace evidence (such as semen) was conducted.

It is my understanding from your book that even under the most ideal conditions, the color and type of materials things are made of, as well as what kind of soaps they've been washed with, can help to hide trace elements and should not be solely relied upon. As mentioned above, one was white and one was blue, and made of a type of material that couldn't be printed.

\* \* \*

Question 7: Should Srg. Stanley have taken these purse(s) into custody so that they could be sent off to the D.P.S. for their professional analysis?

\* \* \*

Ragle's Letter:

Answer 7: Re the purses going to D.P.S. for examination. Answer: Yes, absolutely.

\* \* \*

-6-

<u>Evans' Letter</u>:

<u>Evidence Found In The Apartment</u>:

In the previously mentioned Supplementary Investigation Report made by Srg. Noel Stanley, (Montgomery File, page 1), you will see his list of the items of evidence that he "did" take into custody. They are described as follows:

Montgomery File, page 1:

Item 1; Knife believed to belong to suspect.

Item 2: Eye glasses(sic) believed to belong to suspect.

Item 3: Blue mesh shirt believed to belong to suspect.

Item 4: Shirt and panties of victim.

Item 5: Blue tooth brush(sic) recovered from master bathroom believed used in assault.

Item 6: Bed lennin(sic) from master bed where assault took place.

&ast; &ast; &ast;

And then at the bottom of the page he has written the following:

<u>FOLLOW-UP INVESTIGATION</u>:

On 6-17-86 at 4:30 pm, I packaged up the following items of evidence and turned them over to Detective Eva Camp for transportation to DPS lab in Houston.

1. Bed linen from victims(sic) bed
2. Toothbrush
3. Envelopes containing hairs from victims(sic) bed

&ast; &ast; &ast;

As you can see, the knife, eyeglasses, blue mesh shirt, all believed to belong to the assailant; and the shirt (it's also "blue" in the picture) and panties, of the victim but in contact with the assailant, were not sent off to the D.P.S. for their professional analysis. It is my understanding that the colors and types of materials, as well as detergents, can disguise trace evidence even under the most ideal conditions.

&ast; &ast; &ast;

<u>Question 8</u>: In all fairness, I am asking this question from a 1986 perspective. Should Srg. Stanley have sent all of the above items to the D.P.S. for their professional analysis?

&ast; &ast; &ast;

<u>Ragle's Letter</u>:

Answer 8: Re all of the victim's clothing, etc. Answer: Yes.
Although detergents of other brighteners may interfere, biological
stains can still be located and perhaps, identified.

* * *

Evans' Letter:

Evidence Submitted To The D.P.S.:

As mentioned above, at the bottom of this Supplementary
Investigation Report, made by Srg. Noel Stanley on 6-15-86,
he has made a follow-up investigation on "6-17-86", which is
quoted here in the following:

FOLLOW-UP INVESTIGATION:

On 6-17-86 at 4:30 pm, I packaged up the following items
of evidence and turned them over to Detective Eva Camp
for transportation to DPS lab in Houston.

* * *

Now please refer to the enclosed D.P.S. File, page 2,
which is the D.P.S. Physical Evidence Submission Form, dated
"6-18-86", that has no signature, but is presumably made by
Detective Eva Camp. This "6-18-86" date shows that evidence
being submitted to the D.P.S. a day after Srg. Stanley gave
her the items.

* * *

The next page, (D.P.S. File, page 3), which is the same
type of form, shows the items of evidence gathered at the
hospital in the sexual assault kit being also delivered.
There is no date on this form, but if you will please turn to
D.P.S. File, page 5, which is the Evidence Record Sheet, (Used
for the Chain of Custody?), you will see that these items were
"received" by the D.P.S. on "Jan. 18, 1986", and no time is
indicated. This is a day after Det. Camp received the items
from Srg. Stanley.

* * *

And again, in D.P.S. File, Page 7, (of a two-page form,
7-8), which is titled "Texas D.P.S. Criminalistics Results",
Ms. Sondra Denney, the D.P.S. Chemist, has written a Submission
Date of "6-18-86", submitted by Det. Camp in person.

* * *

The items were clearly given to Det. Camp on 6-17-86 at
4:30 p.m., and were not delivered until a day and night later
on "6-18-86".

* * *

Question 9: Should Srg. Stanley have allowed these items to
leave the security of his lab a day and night before they were
intended to be delivered to the D.P.S.?

* * *

-8-

<u>Ragle's Letter</u>:

<u>Answer 9</u>: Re Stanley allowing evidence to leave his lab. Answer:
Biological and suspected stained evidence should be, at least,
refrigerated (better frozen) while not being examined. There should
be a logical reason why it was removed on the 17th and an
explanation as to where it was with Camp over night.

* * *

<u>Evans' Letter</u>:

<u>Question 10</u>: Does Det. Camp's place in the chain of custody
matter, especially in light of the fact that she had to put
the items somewhere overnight?

* * *

<u>Ragle's Letter</u>:

<u>Answer 10</u>: Re camp's place in the chain. Answer: Absolutely,
for your reason stated and that the items remained sealed in their
packaging.

* * *

<u>Incomplete And Contradicting Forms</u>:

In the enclosed D.P.S. File, Pages 2,3, &4, which are
the D.P.S. Physical Evidence Submission Forms, presumably
made by Det. Camp, you will find the following contradictions
and omitted information:

1. On pages 2 & 3, there is no signature.

2. On page 2, the Submitting Agency No. is "86-14560",
and on pages 3 & 4, the Submitting Agency No. is "TX 1700000".

3. They have my age on page 3 as "19", but on page 4 as
"20".

4. Notice that on page 3, which contains the sexual assault
kit evidence gathered off the victim, ms. Stryker, at the
hospital, has my "name" as the suspect. The evidence was
"received" by the D.P.S. on 6-18-86, (see the Evidence Record
Sheet on page 5), which is the same day that I presume the
other form must have been filled out by Det. Camp. I was
already the suspect at this date, yet the handwritten form
made by Det. Camp does not have my name on it as does the
one that is typed up, (D.P.S. File, page 2). The way these
forms are filled out, they look like they were made by either
different people or at different times. One person wouldn't
sit down and go through all the trouble to make these forms so
different, in my eyes.

5. Page 3 has no Submission Date.

6. Pages 2 & 3 have the Zip Codes in the spaces labeled
"Submitting Agency" and "Send Report To: (Agency)", as "77301",

-9-



and on page 4 it is 77385".

　　　　　　　　　　　* * *

Question 11: I tried to obtain the "Backs" of these forms but
the General Counsel's Assistant, Pamela Smith, (Austin), would
not allow me a copy and refused to assist me without an Order
to do so. The copies they gave me didn't have backs on them,
and I wanted to see exactly what the "Detailed Instructions On
The Back Of The Sheet", stated, and to see what Det. Camp
wrote under the "Note: A Brief Synopsis Or Offense Report
Attached To This Submission Will Greatly Enhance Our Ability
To Assist You With Your Investigation." My curiosity about
this last was raised by the note written on the bottom of
D.P.S. File, page 5, "Refrigerated only-6 days  She is most
interested in hairs", which teels me this was written at least
four days after the evidence was submitted by Det. Camp, and
that somebody is probably reading this from some other place,
not remembering what Det. Camp said; and I was curious because
the Chemist, Ms. Denney also testified in my trial that one
of the hairs was short, with a slight curl to it, as if from
the arm of a man, yet this is not supported by any of these
documents found in the D.P.S. File.

　　　　Now, do you believe that it is a requirement that the
D.P.S. Evidence Submission Forms, pages 2, 3, & 4, should be
completely filled out, with uniform information on them?

　　　　　　　　　　　* * *

Question 12: Should these D.P.S. Evidence Submission Forms
be filled out completely and correctly, in order that the Chain
Of Custody will be preserved?

　　　　　　　　　　　* * *

Ragle's Letter:

Answer 12: Re complete forms. Answer: Obviously all forms should
be completed and correct. Some errors or omissions may simply be
due to sloppy work. However, if a person who is known to have
examined the evidence, or opened it for any reason, has not noted
this fact on the packaging (or evidence tag) or within a proper
follow up report, the chain may be broken. Simple blunders (your
age, for example) or omissions may be disregarded by some courts.
Mr. Canlas (or appropriate counsel) will have to establish which
of these chain faults prevented you from getting a fair trial.
From my perspective, there are a lot of major issues that prevented
you from getting a fair trial.

　　　　　　　　　　　* * *

Evans' Letter:

Partial Or Whole Prints:

　　　　In Srg. Stanley's "Supplementary" Investigation Report,
(Montgomery File, page 1), you will see that he has written:
"I attempted to fingerprint several item(sic) without success."

-10-

This is not true. In his "primary" 2-page report, that the officials will not let me have copys of, and in the portion of his trial testimony that has been carefully edited & rewritten, he stated that a partial and/or a whole print were found on the edge of the glasses and on the knife.

The D.A., Mr. Stover, also held up the glasses in court and said that an overzealous officer would occasionally pick up an item to inspect it, meaning Officer Dunn, and indicated that this is where the print came from. Mr. Stover just put this in there on his own, because there was no evidence in the trial to indicate that any of the evidence was compared to any other person than me. As he did throughout the whole trial, when faced with an obstacle he just made up something and from then on it was the new fact.

\* \* \*

The following is all that is left of Srg. Stanley's print testimony:

S.F. Vol. III, page 357, lines 10-22:

Q:[BY D.A., MR. STOVER]Did you have an occasion to try to lift any fingerprints from State's Exhibit No. 1, the eyeglasses?

A: Yes, I attempted them.

Q: Were you able to get any readable prints from State's Exhibit No 1?

A: No.

Q: Did you attempt to lift any fingerprints from State's Exhibit No. 2, the knife?

A: Yes, I did.

Q: Were you able to retrieve any readable prints from State's Exhibit No. 2?

A: Yes.

\* \* \*

Question 13: Should a partial or whole print have been followed up on by the police?

\* \* \*

Ragle's Letter:

Answer 13: Re partial prints. Answer: Yes. Standard operating procedure is to compare every recovered friction ridge information to all parties, suspects, victims, every one who is known to have been in the scene (the friend and the security guy) including all officers, investigators and civilian personnel (Jackson). Any amount of characteristics (minutia points) on the knife and glasses should have been compared to all of the above, at a

-11-

minimum. An unidentified latent could indicate another suspect.
* * *

Evans' Letter:

In the following you will see that there was some type of "smears" on the doorknob. I'm not concerned with the fact that the smear was not a readable print, but what of the smear itself? Wouldn't a smear have to be made by some type of substance? Perhaps semen?
* * *

S.F. Vol. III, page 361, lines 18-23:

Q: [By Mr. Hall, Lawyer Assisting My Lawyer]What did you find on the doorknob, if anything?

A: Nothing that would indicate somebody might have touched it. It was just a smear across, like it might be two hands slipped or something like that, even if it was a hand. But it was just a smear.
* * *

And again, to the D.A., Mr. Stover:

S.F. Vol. III, page 363, lines 4-11:

Q: Sergeant Stanley, you described smears you found on the doorknob. Did you find smears in the other locations in the house that you attempted to lift prints from?

A: There was an indication that there was some type of touching or could have been fingerprints, but it was nothing that I could distinguish as fingerprints.
* * *

There is something here that he can actually see, if I am correct.
* * *

Question 14: Should or could these "smears" have gathered and sent off to the D.P.S. for analysis? If it would have been a smear made by bloody hands it would have been obviously collected. Why not semem? There were two semen stains on the sheet, so the substance was present.
* * *

Ragle's Letter:

Answer 14: Re smears. Answer: Your point is well taken but in 1986 only a skilled or experienced investigator would have the foresight to swab the smear on the door knob. It should be standard procedure today.
* * *

Evans' Letter:

-12-

## D.P.S. LABORATORY RESULTS:

### Hair Analysis:

Enclosed with these questions is the previously mentioned packet of D.P.S. related documents I've titled, "D.P.S. File, L2H-54833". It is 22 pages, including their cover sheet. At my request, this information was sent to me by the General Counsel's Assistant, Ms. Pamela Smith, (Austin), in March 2003.

This packet contains, in part, the Hair Results of the comparison tests run against my hairs and those found at the crime scene and found on the victim, Ms. Stryker, in the sexual assault kit.

As already mentioned, this Statement of Facts has been greatly edited, and in some places it now shows statements being made that didn't even occur.

Ms. Stryker stated in my trial that she had been divorced from her husband for nearly two years, and that"she'd not had sex with anyone in two years,"(S.F. Vol. III, page 312 lines 24-25, through page 313, lines 1-8), and that"no person had so much as walked into the bedroom portion of her apartment in those two years, (edited out)."

I should mention at this point that Ms. Stryker stated that her front door was locked when she went to sleep, yet no person with access to a copy of the keys were considered. Did her ex-husband have a key? The security guy?

All of the evidence gathered at the scene was believed by the police to be the link between Ms. Stryker's assailant and the crime. This belief was supported by Ms. Stryker's statement that only the assailant had been in her bedroom in nearly two years. From a police point of view, this should be the ideal crime scene for linking evidence to an assailant. Only Ms. Stryker and her assailant had been in the room in two years.

Hairs, fibers, fecal and semen stained sheets, were all sent to the D.P.S. for analysis, and when none of it was linked to me in any way, the State and its officials changed up their "words" and went around their original belief that it would be a link to the assailant. I was the only suspect and they made no attempt to follow up on anything contrary to their belief that I committed this crime.

As mentioned, the D.P.S. Chemist, Ms. Sondra Denney, did testify in my trial, but the Hair Specialist, Mr. Randy Snyder, did not. I've also found a case in the law books where the chemist was allowed to testify for a hair specialist, just like my case, which was reversed because of this, and the guy's name is 'Warren' R. Snyder, (please see Cole v. State, 839 S.W.2d 798(Tex.Crim.App.1992)). I've considered the possibility that this hearsay testimony given by Ms. Denney was edited because

-13-

of this case. That someone has tried to hide it.

At any rate, I had a right to have a hair specialist there to testify in my behalf, and because of that, this is probably the single most valuable group of questions I am asking outside of Ms. Denney's perjury.

* * *

Question 15: Based on the enclosed hair results, found in D.P.S. File, pages 17-22, does there appear to be any hairs not similar to the victim's or my own, that should have been followed up on by the police?

* * *

Ragle's Letter:

Answer 15: Re hair follow up. Answer; In 1986, until there was another suspect, un-excluded hair had no great value. Today, it is possible to identify one or two forms of DNA in hair. What is important here is that none of the hairs matched you so there were hairs that didn't belong to you or the victim, if I read your info correctly. So, someone else, male or female, was in that bed during or before the assault. Today, if there is tissue (skin cells) on the root, the sex of the donor could be established.

* * *

Evans' Letter:

Some of the hairs were Macro compared, but not Micro compared. I'm not sure why, but I presume that they were not Micro compared to mine because they were obviously not similar. I can understand this. But, some of the hairs were also Macro similar to Ms. Stryker's, and not Micro compared. It seems to me that Macro similar hair should be a reason for Micro comparing; to make sure. Some of these head hairs are even longer than my known hairs, and shorter than the victim's known hairs, (please see D.P.S. File, page 18, Item 7/J).

* * *

Question 16: Should any of the hairs that were Macro compared, have also been Micro compared?

* * *

Ragle's Letter:

Answer 16: Re Micro exams of the hairs. Answer: Yes, if they appear similar to one of the key people. It appears that the hair expert did properly examine all of the hairs and you were not a donor. The DA confused this clear picture with his misstatement of fact in his question to Denney. In my non-qualified opinion that alone should have got you a new trial, solely on that prosecutorial error.

* * *

Evans' Letter:

-14-

Enclosed with these questions are a condensed version of some of the issues I am raising in a Texas Writ Of Habeas Corpus, (T.C.C.P. article 11.07), under my ineffective assistance of appeal counsel issue. They are titled:

a. Factually Insufficient Evidence;

b. Identity, which is the identity portion of the Factually Insufficient Evidence issue;

c. Chain Of Custody on the Eyeglasses,(because it further addressess this item of evidence);

d. Suggestive Photographic & Physical Identification Procedures, (which shows the steps to my being arrested and identified).

* * *

These 36 pages have been included to aid you in answering this Question 17. If my lawyer can get the whole, unedited version of my trial, then I will try to have that forwarded to you because it will be more specific.

* * *

Question 17:

Based upon your professional experience can you please give an opinion of the value of the hair results? In other words, what type of impact would a hair expert defense witness have had on a jury, under these facts of evidence, if one would have testified? Could a 'reasonable doubt' have been put in the jury mind about my being the assailant, based upon the hair results? Should these hairs, gathered under the conditions previously detailed, have positively excluded me as the assailant?

Though edited out of this record, Ms. Denney, the D.P.S. Chemist, stated that a hair is always going to be pulled from the groins of two people having sex. To my untrained mind, Mr. Snyder, the D.P.S. Hair Specialist, makes it look as if my hair is unique because of the looping and triangular segment that is not found in any of these other hairs.

In your book you state that hairs can occasionally be raised to the level of a print. To my mind, here are all of these "prints", believed to be the link to the assailant, (until not linked to me), and they were ignored by the police. They were found either on the head and groin of a person who had not had sex in two years, or in a bed where no person had been in two years.

How strong of an impact should the hair specialist's statement that "No hair(pubic or head) similar to suspect's hair present.", have made on the jury if spoken by an expert with firsthand knowledge of the reasons for this conclusion? To me this is like undisputable evidence. If it would have

-15-

been hair "similar" to mine, that fact would have been the dominating point made by the State to justify convicting me. (Please remember that I am asking this from a June-October 1986 perspective.)

\* \* \*

## Ragle's Letter:

Answer 17: Re calling the hair expert. Answer: absolutely, you should have been allowed to call Snyder. His factual report was entered into the record by your attorney and Denney said, at least twice, you were excluded as being a source of the hairs, but then the DA did another questionable trick. After he got Denney to answer his tricky question re his stating "Evans' hair found at the crime scene" he dropped another bomb, asking the question about pulling a hair from you now and then later comparing a known hair (from you). He asked, isn't it true that the most one could say is the hairs could have come from him (Evans)?

That was true at the time, matching hairs in every possible test were not an absolute identification. Is he trying to confuse the jury into believing that exclusion is not absolute? And then he mentions your blond hair for no apparent reason. This entire line of questioning should have been challenged.

\* \* \*

## AND FROM PAGE ONE OF RAGLE'S LETTER:

Perhaps the most shocking statement in the transcript is found on your page 387, line 4, where Mr. Stover recalls Denney's testimony 45 minutes earlier and concludes, "....hairs submitted to you that were collected at the scene that belonged to Thomas Evans." How did he get away with that?

\* \* \*

My over-all impression is, you are a victim of, 1. Ill prepared investigator's who failed to process the scene properly, 2. Serious defects in the manner in which the physical evidence was handled and the results presented in court, and 3. A prosecutor who misstated some critical issues.

\* \* \*

## EMPLOYMENT Curriculum Vitae

## JOHN L. (LARRY) RAGLE
## FORENSIC SCIENCE CONSULTANT

**EDUCATION**
University of California, Berkeley, Bachelors of Science, 1959
Major-Criminalistics

California Peace Officer's Training Academy, 1957

**EMPLOYMENT**
1990-2006 Center for the Forensic Sciences - Consultant in:
Management
Facility Design
Needs Assessments
Case Review
Trial Preparation

1976-1989 Orange County Sheriff-Coroner's Department, California
Director of Forensic Sciences
Directed the activities of the Criminalistics Laboratory, Toxicology
Laboratory, Coroner's Investigations and Pathology Section,
Identification and Scientific Crime Scene Investigations and the CAL-ID,
AFIS/ALPS.

1960-1976 Orange County Sheriff-Coroner's Department, California
Criminalist
Responsible for evidence examination in a variety of crimes, crime
scene evaluation, testimony and interpretation of evidence for the
Grand Jury and in Municipal, Superior and Federal Courts.

1956-1960 City of Berkeley, California
Patrolman/Investigator

**SPECIFIC EXPERIENCE**
Criminal Investigation
Crime Scene Investigation
Laboratory evidence evaluation
Case management
Case review
Day to day laboratory operations
Evidence security and control
Evidence handling and chain of control (possession)
Courtroom testimony
Forensic Science training programs
Laboratory management
Laboratory safety
Laboratory Information systems
Automated fingerprint systems
Laboratory design


**FACILITY PLANNING, NEEDS ASSESSMENTS AND CONSULTING**
1977-1985 Orange County Sheriff- Coroner's, California
    Planning, construction and operation.

1985-1989 Orange County Sheriff-Coroner's, California
    Planning new facility (189,000 sq. ft)

1989-1990 Hutton Development, Santa Ana, California
    Space Planning

1991-1992 San Diego Regional Forensic Laboratory, California
    Needs Assessment

1991-date Titan Corporation, San Diego, California
    Development - Laboratory Information Management System

1992-1992 Contra Costa County Sheriff-Coroner's Department, California
    Regional Needs Assessment.

## PROFESSIONAL ORGANIZATIONS

California Association of Criminalists
President 1973
American Academy of Forensic Sciences
Fellow
California Association of Crime Laboratory Directors
Emeritus
American Society of Crime Laboratory Directors
Emeritus

## APPOINTMENTS

1986-1989 California Criminalistics Institute Advisory Committee
California Department of Justice

1986-1989 CAL-ID RAN Operational Advisory Committee
California Department of Justice

1985-1989 California State Epidemiology Work Group
California Department of Health

1987-1989 Forensic Science Operations and Program Committee
Federal Bureau of Investigation

1988-1989 Attorney General's DNA Advisory Board
California Department of Justice

## LICENSES AND CERTIFICATES

State of California, Commission on Peace Officer's Standards and Training- Advanced Certificate

State of California, Department of Health
Licensed Supervising Blood Alcohol Analyst 1966-1989

State of California, Department of Education
Life Time Special Designated Teaching Certificate



California Association of Criminalists
Certificate of Professional Competency 1989-1994

## TEACHING AFFILIATIONS

1968 to 2006   California State University, Long Beach, Center for Criminal Justice.  Lecturer - Forensic Sciences , Crime Scene Investigation.

1988 to 2002   University of California, Irvine Extension.  Lecturer - Forensic Science.

1970 to 1976  California State University at Long Beach, Assistant Professor, Criminalistics Program.

1978 to 1984  Western State University of Law, Lecturer, Forensic Sciences.

1974 to 1978  State of California, Arson Investigation Training, Monterey, Ca. Crime Scene Investigation.

1964 to 1970   Riverside City College, Lecturer, Criminal Investigation, Crime Scene Investigation.

## TECHNICAL AND MANAGEMENT PUBLICATIONS, PRESENTATIONS AND STUDIES.

Ragle, J.L., *Extraction of Amphetamine from Urine*, California Association of Criminalists, Semi Annual Meeting, 1963.

Ragle, J.L., Etal, *Physical Evidence Manual*, Federal Grant, Sections on Classification Of Evidence, Crime Scene Documentation. 1976.

Kenny, John, Editor, Etal, *Principles of Criminal Investigation*, Eagan, Minnesota, West Publications, 1979. Ragle, J.L., Chapter on Forensic Science and Crime Scene Investigation.

Ragle, J.L., *The Falsification of Evidence, Fingerprints Don't Lie?*, American Academy of Forensic Sciences, Annual Meeting, 1980.

20



Ragle, J.L., Suchey, J. , *A Human Jig Saw Puzzle Match*, American Academy of Forensic Sciences, Annual Meeting, 1985.

Ragle, J.L., *The Elusive Elastic Crime Laboratory*, Presented to the American Society of Laboratory Directors. FBI Academy, 1989.

Ragle, J.L., Togneri, E. N. , *Needs Assessment and Management Study, Consolidation of the San Diego Police, Sheriff's and Medical Examiner's Laboratories*, Ruth and Going, 1992.

Ragle, J.L., Togneri, E. N., *Needs Assessment for a Regional Forensic Laboratory, Contra Costa County, California.* 1992

Ragle, J.L., *Crime Scenes, The Value of Forensic Science*, (tentative title) New York, Morrow / Avon, In publication, to be released October 1995.



I have read pages 1 through 16 prepared by Thomas Evans and have reviewed my original document of 4-7-04 sent to Mr. Evans. Each answer attributed to me, #1 to #17 is taken, word for word, from the document of 4-7-04 that I prepared in response to his questions in an earlier letter. He has accurately positioned each answer, except answer #11 (see below), in relation to a question. These questions are in Mr. Evans' own words and are based on information from assorted documents (reports and transcripts) relating to his arrest and trial. I have read those documents and believe each question is relevant based on my recollection of the facts, although I cannot attest to the absolute accuracy of Mr. Evans' narratives between my answer and the next question.

All of the answers and statements attributed to me are based on my experience as a peace officer and a forensic scientist. I have examined similar cases. I have testified in California courts hundreds of times on a wide variety of crimes with absolute confidence that the lab results and the testimony given were fair and accurate.

Answer #11- Re backs of reports: Answer. Absolutely. If this is a discovery order you should receive every written document that could implicate or exonerate you, both sides of all written notes

John L. (Larry) Ragle

SUBSCRIBED AND SWORN TO BEFORE ME on _____1/31_____,2008, to certify which witness my hand and seal of office.

DENISE C. LUCIANI
Commission # 1781949
Notary Public - California
Orange County
My Comm. Expires Dec 21, 2011

Notary Public
State of California
County - Orange

-22 -

*Exhibt #4*
*Court of Criminal Appeals*

CAUSE NO. 19,180
APPELLATE NO. 09-86-00240-CR
P.D.R. CASE NO. 1382-88

PORTION OF STATEMENT OF FACTS
VOLUME III, PAGES: 365-389

Sondra Denney's Complete Testimony:

365-373, Direct Examination.

373-386, Cross-Examination.

387-388, Redirect Examination.

389, Recross-Examination.

I do hereby certify that the following 750 pages are true and correct copies of the Index To Instruments, Volume One and Two, Opinion "Convicted", Opinion "Delivered", Hearing On Motion For Indigency, Transcript of Trial, Brief For Appellant, Brief For The State, Appellant's Motion For Rehearing, Appellant Petition for Discretionary Review and the State's Response To Appellant's Petition For Discretionary Review for Case No. 09-86-00240-CR, in the Court of Civil Appeals for the Ninth Supreme Judicial District of Texas at Beaumont, The State Of Texas vs. Thomas Lee Evans, now on file in the Sam Houston Regional Library & Research Center of the Archives & Information Services Division of the Texas State Library & Archives Commission.

Witness my hand and Seal of Office at Liberty, Texas on the 8th day of July, 2002.

Robert Schaadt, Director
Sam Houston Regional Library & Research Center

SONDRA DENNEY,

a witness, called by the State, having been first duly sworn, was examined and testified upon her oath as follows:

## DIRECT EXAMINATION

BY MR. STOVER:

Q.    Would you state your name to the ladies and gentlemen of the jury, please?

A.    Sondra Denney.

Q.    How are you employed, Ms. Denney?

A.    I'm employed as a chemist by the Texas Department of Public Safety Laboratory in Houston.

Q.    What training or education do you have to qualify you for the position you now hold?

A.    I have a Bachelor's of Science Degree in Chemistry, in addition to which I've undergone on-the-job training both at the Houston Police Department Crime Lab and the Texas Department of Public Safety Lab in Austin, in addition to which I've attended school, The Bladter Serology Research Institute in California and FBI Academy in Virginia.

Q.    How long did you work for the Houston Police

Crime Lab?

A. For almost three years.

Q. What years were those, do you remember?

A. Let's see, that would be, I believe it was 1981 through 19 -- of 1983.

Q. Who was the director of the crime lab when you started work there?

A. Floyd McDonald.

Q. And is Floyd McDonald one of the recognized experts in the field of chemistry and toxicology in the police department throughout the country?

A. To my knowledge, he is.

Q. And did Mr. McDonald leave during the period you were there?

A. Yes, he did.

Q. Did Pete Christian then become the director of the lab?

A. Yes.

Q. Did you receive on-the-job personal instruction from both of those recognized experts?

A. Not at that time.

Q. Did you later -- or what type of training did you receive while you were working there?

A. I received instruction from the head serologist of the laboratory.

P.O. Box ...
liberty, Tx ...

Q. What type of work did you do there?

A. Serology.

Q. Would you explain to the jury what serology is?

A. Serology is the analysis of body fluid stains to determine the type of stains, i.e., semen or blood or saliva. In other words, what sort of fluid it contains, and also to determine the origin as being human origina. And, also, to determine genetic markings present in the stain.

Q. Would you explain to the jury what you just said, please, so they -- I'm not real sure I understood; so, let's start again.

You examine blood stains, serology?

A. I examine all sort of blood fluid stains. Blood, -- including, blood, saliva, semen or any other body fluids.

Q. When you say "blood," do you do a test to determine the blood type?

A. Yes.

Q. And when you find seminal stains, what can you learn from examining a seminal stain?

A. You can determine in some cases ABO blood group, and also determine a couple of other genetic markers, provided that the stain is strong enough.

Q. Do you do the same type of work for the Texas Department of Public Safety?

A. Yes, I do.

Q. I believe you said you worked in the Houston office?

A. Yes.

Q. Did you have an occasion to examine some evidence submitted by Detective Eva Camp from the Montgomery County Sheriff's Department?

A. Yes, I did.

Q. Do you have a case number on that?

A. Do you want her case number or my case number?

Q. Both of them.

A. The Montgomery Sheriff's Department number is 86-14560, and my laboratory No. is L2H-54833.

Q. Do you have a list of the items that were submitted to you for examination?

A. Yes, I do.

Q. And what would that list consist of?

A. The original evidence consisted of a toothbrush, a fiber sample, two hair samples, a fitted bedsheet, a flat bedsheet, a sexual assault evidence kit from the victim, a pair of sweat pants, a sweat shirt and a white paper sheet which was used to collect the victim's clothing

in.

Q. Did you at a later time receive further items of evidence from Detective Camp?

A. Yes, I did.

Q. And what were these items?

A. The additional evidence submitted included a blood sample, some apparent oral smears, a pubic hair sample, and head hair sample from the suspect.

Q. That would have been the suspect, Thomas Evans?

A. Yes.

Q. What type of analysis were you asked to perform on these items of evidence that were submitted, or what type of test were you asked to perform?

A. On the items originally submitted, we were asked to determine the presence of semen or seminal stains, or any type of foreign trace of evidence.

Q. Did you have an occasion to perform a test upon the fitted bedsheet, either 5A or 5B?

A. Yes, I did perform a test on 5A, which was the fitted bedsheet.

Q. And would you tell the jury just what that test showed you?

A. The preliminary test from a couple of stains on the bedsheet indicated the presence of semen.

Memphis Shelby County Library<br>Memphis, Tenn.

The stains were collected and I ran what is called the P30 test. P30 is a substance which is found, exclusively found in semen and not in any other substance. It is a test which is specific for semen. And there was P30 present in the two stains on the bedsheet, which would indicate the presence of semen in those stains.

Q. And this is seminal fluid that comes from a male?

A. Yes.

Q. Did you run any further tests or were you asked to run any further tests?

A. Yes, I did. I made an attempt to determine the ABO blood group of the semen present.

Q. Was there sufficient semen present to make this test or to give you a positive or negative reading on it?

A. The test was inconclusive. And I also attempted to determine the amount of semen present. From the determination of the amount of semen present, I concluded that there was not enough semen for the test to be conclusive one way or another. There has to be a certain amount of semen present in order to determine ABO blood group or genetic markers.

Q. So, I gather, based on the test that you ran on

the stains on the bedsheet, the only thing that you can conclusively tell this jury is that there was seminal fluid present; is that correct?

A. That's correct.

Q. But you could not tell them the blood group of the person that the seminal fluid came from?

A. That is correct.

Q. Now, were any tests done by the DPS on any of the hairs that were submitted?

A. Yes, there were.

Q. And you were submitted known head hairs and known pubic hair samples of the Defendant, Thomas Evans; is that correct?

A. Yes.

Q. And the tests and comparisons that were made of the other hairs, were any hairs found that you could conclusively say belonged to Thomas Evans?

A. No.

Q. Were there any tests run to determine whether the hairs belonged to Maury Stryker?

A. No, there were not.

Q. So, the tests that were run, the only thing you can conclusively tell this jury is that the hair samples that were submitted that were collected at Maury's apartment did not belong to this

Defendant?

A. That's correct.

Q. But you don't know who they belong to?

A. That's correct.

Q. And there was seminal fluid present on the sheet, but there wasn't enough there to tell you the blood type of the person that ejaculated the semen; is that correct?

A. That is correct.

Q. Did you do any other type of tests that I haven't asked you about?

A. I did perform tests on the vaginal, anal and oral specimen from the sexual assault kit.

Q. Okay. Did any of those tests show the presence of seminal fluid?

A. None of these tests showed the presence of seminal fluid.

Q. If the person did not have an ejaculation, though, would that surprise you to be negative?

A. If there was no ejaculation in any of these areas, it would not be surprising.

Q. That's all my questions. Thank you very much, Ms. Denney. The Defense, I'm sure, will have questions for you also.

MS. LUEDICKE: Your Honor, may I take

just a moment to look this over?

THE COURT: Uh-huh.

CROSS-EXAMINATION

BY MS. LUEDICKE:

Q.   Ms. Denney, in connection with your analyses of the evidence submitted to you in connection with this case, did you prepare any other reports other than this criminalistic report which was submitted to the Prosecutor here? Do you have some other records with you?

A.   Pardon?

Q.   Do you have other records with you?

A.   Only my laboratory notes which are covered in the report.

MS. LUEDICKE: May I approach the witness, Judge?

THE COURT: Yes.

Q.   (By Ms. Luedicke) Ms. Denney, may I see those notes, please? Are these legible?

A.   They're legible. I don't know if you can interpret them. (Handing to Ms. Luedicke.)

THE COURT: Do you want to review those?

Regional Library
P.O. Box
Liberty, Tx 77575

Would the jury please go back to the jury room.

(Jury leaves.)

(Jury returns.)

MS. LUEDICKE: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (By Ms. Luedicke) Ms. Denney, I'm going to hand you items that have been marked Defense Exhibits No. 3 through 10 for identification, and ask if you can identify them?

A. Yes, I can.

Q. And what are they?

A. Exhibit 3 through 6 are work sheets which we use in the Serology Department of the laboratory, which I used primarily in this case, which would be serology examination sheets for all the items of evidence.

Q. And are those reports written in your handwriting?

A. Yes.

Q. Were they prepared by you in connection with your

investigation of this case?

A. Yes.

Q. Were these prepared by you at the time of your investigation and analyses in this case?

A. Yes.

Q. And the next exhibit?

A. Exhibits 7 and 8 are my copies of the official report in this case.

Q. Was that a report prepared by you in your office in connection with this case?

A. Yes, it was.

Q. Was it prepared in connection with your analyses of the chemical work that you did in evidence in this case?

A. Yes.

Q. And Exhibit 9, is that --

A. Exhibit 9 is a handwritten copy of the hair result, which would be put into the case report, which were prepared by the hair expert who analyzed the hairs.

Q. Was that also prepared in connection with this case?

A. Yes, it was.

Q. Was it prepared by you?

A. It was prepared by Randy Snyder. He's our hair

examinations expert.

Q. Has that been in your file since it was prepared?

A. Yes.

Q. As part of your case report?

A. Yes.

Q. And Exhibit No. 10, what is that?

A. These are Randy Synder's personal notes that he prepared at the time he was performing the hair examinations.

Q. And are those notes, have they been in the case file since the time of their preparation?

A. Yes.

Q. And were they prepared at the time of the examination and analyses in the case?

A. Yes.

MS. LUEDICKE: Your Honor, we'll offer into evidence Defendant's Exhibit 3 through 10.

MR. STOVER: May we approach the bench, please, Your Honor?

THE COURT: Yes.

MR. STOVER: Your Honor, the State has no objection to Defendant's Exhibit 3, 4, 5 and 6, and although I think Exhibit No. 7 is -- 7 and 8 are just absolutely

rank hearsay, I have no objection to them. But Defendant's Exhibit 9 and 10, as the witness has testified, are handwritten notes prepared by somebody else. It is hearsay, and I object to that on that basis. And these are not reports made by her or anyone under her direction.

MS. LUEDICKE: Your Honor, if she's testified as to the hair samples and analysis of the hair sample, analysis tests --

Your Honor, we have subpoenaed Roy Snyder.

THE COURT: Overruled. It will all be admitted.

MR. STOVER: Thank you, Judge.

(Defendant's Exhibit Nos. 3, 4, 5, 6, 7, 8, 9 and 10 were admitted into evidence.)

Q. (By Ms. Luedicke) Ms. Denney, I'm going to hand you Defense Exhibit 3 and again ask if you would explain for the jury's benefit exactly what that is?

A. This is a sexual work sheet which we use in our laboratory. And this was the work sheet that I used when I was examining the items of evidence in the victim's sexual assault evidence kit. It is a listing of the items and the corresponding columns from left to right, are numbers of tests that had been initially run on the sexual assault kit items and the results of those tests, if they were proved.

Q. And I'd like to ask you now if you would, please, to explain to us the entries on the sheet, the results of the tests that you performed on it, starting with A.

A. A is a set of vaginal smears which were in the sexual assault kit. And I looked at them under the microscope to attempt to see if spermatozoa, which are male reproductive cells, male ejaculate, are in the semen. And the results were that there were no sperm detected on the smears.

Q. Continuing on, what was B?

A. B is a set of anal smears, which again I examined microscopically for the presence of spermatozoa. And no spermatozoa were prsent.

C is a set of oral smears which was

Sam Houston Regional Library
Research Center
FM RD 1011
P.O. Box 310
Liberty, Tx 77575

examined for spermatozoa, and no spermatozoa were detected.

Q. All right, Ms. Denney. D is vaginal swabs. Would you explain that for the jury?

A. D, the vaginal swabs -- may I just demonstrate this?

Q. Please continue reading.

A. And E, anal, and F, for oral swabs, and all three of these items were tested for the presence of P30, which as I explained earlier, is a component of semen which is exclusively found in semen. If I had found this component P30, I could state that semen was present.

All three items tested were negative for the presence of P30, indicating that no seminal fluid was present on these items.

Item No. F, the oral swabs were also tested for amylase, which is a component of saliva, and were found to contain amylase and therefore determined to be conclusive. So, therefore, they were also tested for secretor status. This was to determine the secretor status of the victim and it was to determine the origin nonsecretor, meaning she does not secrete her body fluid in her body fluid ABO blood group. A certain

percentage of the population are secretors, meaning you can get ABO blood group substances from their body fluid other than their blood. In this case this would not be the case.

Item G is a loose evidence collection envelope. And this is usually used to collect any loose evidence which is found on the body at the time of the doctor's examination. There were four pubic hairs recovered from this envelope.

Item H is a pulled pubic hair sample of the victim.

And Item I is a pulled head hair sample.

Item J is a loose head hair sample from the victim, which, again, is usually selected from the victim's scalp at the time of the examination by the doctor.

Item K is a nasal sample.

Item L is a blood sample from the victim, which I determined to be Type O.

Items M and N are right and left-hand fingernail scrapings which contain soil and no significant trace of evidence.

Q.    When you say "fingernail scrapings," are those taken from the victim?

A.    Yes.

Q.    For what purpose do you analyze those?

A.    In some cases, and I would say relatively few, you can find important traces of evidence in fingernail scrapings, such as blood or the tissue samples, if she may have scraped the assailant; or sometimes find microscopic fibers which can be linked back to the assailant.

Q.    And there was none in this case?

A.    That's correct.

Q.    Returning to the Item H, pulled pubic hair.  Am I correct, was that hair that was found at the scene?

A.    No.  That would be hair that would be pulled from the victim.

Q.    From the victim.  Would you please read to the jury the description of that hair that you have on your report.

A.    This is a microscopic examination for my notes, not by any means a hair comparison.  You must -- broken, slightly kinky and curly.

Q.    Pulled hair, Item I.  That is also from the victim?

A.    Yes.

Q.    All right.  And would you read the description of that hair?

A. Brown, dark brown, straight and medium in length.

Q. Okay. Item J is loose head hair. Was that also from the victim?

A. Yes. There were a few hairs that were microscopically similar to the victim's head hair.

Q. And I believe one that says nasal sample. Would you explain that?

A. Yes. Nasal sample is something that was included originally in this particular rape kit. This is a prepacked rape kit and it has since been dropped from the rape kit. It is not used and not working out the way it is supposed to work. In other words, it has no real value. But these kits are obviously older kits which still had them, and any instructions to take samples; so, the doctor took it.

Q. Ms. Denney, Defense Exhibit No. 4, would you please read to the jury each of those entries?

A. No. 1 is a light brown toothbrush on handle Omni 2. I'm sorry, O-N-N 2. There was no trace of evidence detected on this item.

Item No. 2 is an envelope which was lab dusted roughly and it contains one small red fiber.

Sam Houston Regional Library & Research Center Liberty, TX 77575

Item No. 3 is an envelope labeled "pillow sham," which contains one broken curly, possible pubic hair.

Item No. 4 is a Ziploc bag containing a few broken, curly, kinky, apparent pubic hairs.

Item 5A is an off-white fitted bedsheet.

And Item 6, there are two stains on this bedsheet, which I tested for both acid phospatase, which is a preliminary screening test for semen and P30, which is mentioned earlier, which was positive.

The inhibition test mentioned on here is, again, the determination of secretor status of the stains and the results on this were inconclusive. There were a few hairs -- I'm sorry, the wrong one.

5B is an off-white, flat bedsheet with eyelet trim, and there were a few hairs recovered from this bedsheet.

Q. Were any analyses run on the hairs that were recovered from the bedsheet?

A. Yes, they were. That would be in the hair results.

Q. Okay.

A. This is only the preliminary result of the

San Diego ? Original Libr...
Reporter Servic...
FM 810 890...
P.O. Box 80...
Liberty, Tx 7758...

serology report and collection of evidence.

Q. Okay. Defense Exhibit No. 5?

A. Item No. 6A is a blood sample from the suspect, Thomas Lee Evans. It was found to be blood Group A.

And Item No. 6B are some smears which are labeled "oral." There was no P30 present. I ran this test primarily because the submission test semen sample was present, and I could not find a semen sample. And assuming this might be a semen sample in that case inhibition test, again, a test to ABO blood group of detected and against A and H. Type A secreted, which told me that the suspect is a Type A secretor.

Again, on this I ran the amylase test. This is to determine the component of saliva. And I found a large amount of amylase was present, indicating a fairly strong dilution of saliva.

I also microscopically observed smears again, just to determine that they were indeed not seminal stains, and determined no sperm where present.

6C is a pulled pubic -- pulled pubic hair sample from the suspect, Thomas Lee Evans,

microscopically observed, blond and curly.

6D is a pulled head hair of the suspect, Thomas Lee Evans, which is microscopically determined to be blond, very fine, and some slightly wavy.

Q. Defense Exhibit 9, case report handwritten on, was that the hair analysis?

A. Yes.

Q. Would you please read the contents of that to the jury?

A. No hair present in Items 3, 4, 5A, 5B or 8 that was similar to the suspect's pubic or head hair.

Q. Ms. Denney, Defense Exhibit No. 10 are handwritten notes regarding hair analysis done in this case; is that correct?

A. Yes.

Q. From those notes, can you determine whether or not an analysis was run on the hairs that were found at the scene of the offense and hairs taken from the accused, Thomas Evans?

A. Yes.

Q. And what were the results of those tests?

A. Excuse me. As I said, the notes are just his notes. And they do not contain a conclusion that I can see, that I do see some evidence that the

Sam Houston Regional Library &
Research Center
FM RD 1011
P.O. Box 310
Liberty, T. 77575

hairs were indeed compared, but an analyst's notes are generally readable to one analyst, if you understand what I'm saying. In other words, he was making notes to himself for this case. These were not notes made to any other analyst.

Oh, he does have a conclusion at the bottom that says: No hair, pubic or head, similar to suspect's hair present, but that's the only conclusion there is. No analysis of his notes.

Q. But it does say there is no hair of the -- of Mr. Evans similar to that found, either pubic or head hair, as to that which was found at the scene of the offense?

A. I would assume so.

Q. I'm sorry, I can't -- I didn't hear what you said.

A. I would assume so. I can't interpret his notes for you. I'm sorry.

MS. LUEDICKE: Pass the witness, Judge.

Sam Houston Regional Library & Research Center
Rt 3, Box 1015
P.O. Box 310
Liberty, TX 77575

## REDIRECT EXAMINATION

Sam Houston Regional Library
Research Center
PM 30 1981
P.O. [illegible]
Liberty, TX 77575

BY MR. STOVER:

Q.    Ms. Denney, just so there won't be any question. I think that you testified on direct examination about 45 minutes ago that the analysis that was run there was done of the hairs submitted to you that were collected at the scene that belonged to Thomas Evans; is that correct?

A.    That is correct.

Q.    Now, just for curiosity's sake, let's assume that I went over and pulled a head hair from Thomas Evans and stuck it in an envelope and didn't tell you who that head hair belonged to, and then you went over a week or a month later and pulled a head hair from Thomas Evans; so, you had a hair in your hand that you knew came from his head. And when you made that comparison, what could you actually tell the jury?

A.    In a hair comparison case, it's generally a matter of excluding someone from having contributed the hair.  The strongest statement which can be made in a hair comparison case, something to the effect if the hairs match my copy, that they could have come from a common

origin.

Q. Could have?

A. Could have.

Q. So, even under the conditions that I named where I know that I took one hair from him and you know I took the other hair from him and you later compared them, the strongest statement you'd be able to make scientifically is that they both could have come from him?

A. That's correct.

Q. Okay. And I believe you said that the known head hair that was taken from Thomas Evans was described in the notes as blond and slightly wavy; is that correct?

A. Yes.

Q. Thank you very much. That's all my questions. Ms. Denney, I appreciate you coming down.

Sam Houston Regional Library & Research Center

## RECROSS-EXAMINATION

BY MS. LUEDICKE:

Q.   Ms. Denney, I believe when Mr. Stover asked you about comparing hair samples from the same person, the best you will be able to trace is perhaps similar origin?

A.   That's correct.

Q.   However, I also understood you to say if they did not come from the same origin, you could positively exclude one from the other; is that correct?

A.   That's correct, if the microscopic characteristics were obviously dissimilar.

Q.   And is it your conclusion from the notes that you have available to you that Mr. Evans' hair is excluded from possibly being that that was found at the scene of the offense?

A.   That's correct.

MS. LUEDICKE:  Pass the witness.

MR. STOVER:  I have no further questions.  Thank you for coming down, Ms. Denney.



# CANLAS
# ELLIS, L.L.C.
### ATTORNEYS & COUNSELORS AT LAW

Mr. Thomas Lee Evans
TDCJ #435211
Beaumont, TX 77705-7635
Attention:  Thomas Lee Evans
**Attorney-Client Correspondence**


January 2, 2004

### Re: Writ for DNA Testing, Update


Mr. Evans:

Progress on your file is slow.  I have read through the entire clerk's file.  There appears to be a lot of documents which are missing or never filed.

I have also spoken to some of the attorneys involved in the case.  Rick Stover, the prosecutor, had a very good memory of your case.  He voiced his opinions.  However, he just passed away recently.  Jimmy Price your appellate lawyer has no recollection of your case.  He is not cooperative at this time.

It appears you may have a valid ineffective assistance of counsel claim against Jimmy Price. Apparently, your appellate lawyer wrote the brief for your appeal with only a partial statement of facts from the court reporter.  His only point of error was the parol instruction.  I don't know the reasons, but I question how a lawyer can write an appeal with all valid claims with only the statement of facts from the punishment stage.  If you had any valid errors during the guilt innocense stage then he would never know.

I still need more time to locate evidence and organize your case to make a valid argument to the Court for retesting.  Today I was submitted the court reporter's record.

As for your Writ, do not do anything on that issue at this time.  Forward all information to my office. I will inquire from the Court if I am to assist you in that matter too.

If you have any further questions please send me a letter or have someone call my office for you.

Sincerely,

Richard Martin P. Canlas, Esq.



**Texas**

Richard Martin P. Canlas
13700 Veterans Memorial Drive • Suite 264
Houston, Texas 77014
Richard_Canlas@CanlasEllis.com

Voice: 281.444.7580
Voice: 936.788.6999
Facsimile: 936.788.5999

Robert J. Ellis, Jr.
First National Bank of Commerce Building - 18TH Floor
210 Baronne Street • New Orleans, Louisiana 70112
Bob_Ellis@CanlasEllis.com

**Louisiana**

Telephone: 504.525.4361
Wireless: 504.669.7977
Facsimile: 504.525.4380